BRAY et al. v. UNITED STATES FIDELITY & GUARANTY CO. et al.

(Circuit Court of Appeals, Fourth Circuit. June 3, 1909.)

No. 812.

BANKRUPTCY (§ 294*)—JURISDICTION OF COURTS—EXCLUSIVE JURISDICTION OF DISTRICT COURT TO ADMINISTER ESTATE.

A Circuit Court of the United States is without jurisdiction of a suit the object of which is to determine liens upon, and priorities in the distribution of, a bankrupt's estate in process of administration by a District Court, the jurisdiction of the latter court in such matter being original and exclusive, and it is immaterial that the property, which is in the custody of the bankruptcy court, is within the territorial jurisdiction of the Circuit Court, or that the suit was instituted by leave of the bankruptcy court.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 412; Dec. Dig. § 294.*

Jurisdiction of federal courts in suits relating to bankruptcy, see note to Bailey v. Mosher, 11 C. C. A. 313.]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg.

The Evansville Contract Company, a corporation under the laws of the state of Indiana, entered into four several contracts with the United States for improvements to be made by the contract company in the Ohio, Big Sandy, and Congaree rivers. One of these contracts was for the construction of a dam in Big Sandy river, Ky., another for the construction of a dam in the Congaree river, S. C., another for the construction of dam No. 3 in the Ohio river at Coraopolis, Ohio, and still another for the construction of dam No. 18 in the Ohio river near Parkersburg, W. Va. It was a requirement of each of the contracts with the government that the contract company should give a bond for the performance of the contract, and in compliance with this requirement the said company, with the United States Fidelity & Guaranty Company as surety, gave four bonds, one dated November 13, 1900, in the penalty of $30,000, for the construction of the dam in the Big Sandy river; another dated October 2, 1902, in the penalty of $30,000, for the construction of the dam in the Congaree river; another dated September 19, 1903, in the penalty of $50,000, for the construction of dam No. 3 in the Ohio river; and still another dated November 21, 1904, in the penalty of $90,000, for the construction of dam No. 18 in the Ohio river. The United States Fidelity & Guaranty Company is a Maryland corporation with its principal office in the city of Baltimore, where it is engaged in a fidelity, insurance, and surety business. In order to procure the United States Fidelity & Guaranty Company to become surety on the several bonds above mentioned, the contract company executed an agreement of indemnity in which it bound itself to indemnify the Fidelity & Guaranty Company against all loss, costs, damages, charges, and expenses whatever resulting from any of its acts, default, or negligence that the United States Fidelity & Guaranty Company might sustain or incur by reason of having executed said bonds or any continuation thereof. It was further a part of the indemnity agreement that, in the event the contract company was unable to complete or carry on the contracts, the said company would assign to the fidelity and guaranty company, and did assign, such plant as the contract company might own or have upon the work, and, in addition thereto, such vouchers or other evidence of payment of all costs and expenses whatever incurred by the fidelity and guaranty company in adjusting loss or in completing the contract. It was also a part of the agreement of indemnity that, in case of breach or default on the part of the contract company in any provisions of the contract, the fidelity and guaranty company should be subrogated to all the rights and properties as principal in the contract, and that

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

deferred payments and any and all moneys and property due and payable to the contract company at the time of the breach or default, and that which thereafter became due and payable on account of the contract, should be credited upon any claim that might be made upon the fidelity and guaranty company by reason of being surety upon the bond. The conditions of each of the four bonds on which the fidelity and guaranty company was surety were the same, and as follows:

"Now, therefore, if the above bounden, the Evansville Contract Co., shall and will, in all respects, duly and fully observe and perform all and singular the covenants, conditions and agreements in and by the said Evansville Contract Company, to be observed and performed according to the true intent and meaning of the said contract, and as well during any period of extension, of said contract that may be granted on the part of the United States as during the original term of the same and shall promptly make full payments to all persons supplying it labor or materials in the prosecution of the work provided for in said contract, then the above obligation shall be void and of no effect; otherwise to remain in full force and virtue."

The provision in the condition of the bonds in regard to the payment for labor and material is by virtue of Act Aug. 13, 1894, c. 280, 28 Stat. 278 (U. S. Comp. St. 1901, p. 2523), which reads as follows:

"That hereafter any person or persons entering into a formal contract with the United States for the construction of any public building, or the prosecution and completion of any public work or for repairs upon any public building or public work, shall be required before commencing such work to execute the usual penal bond, with good and sufficient sureties, with the additional obligations that such contractor or contractors shall promptly make payments to all persons supplying him or them labor and materials in the prosecution of the work provided for in such contract; and any person or persons making application therefor, and furnishing affidavit to the department under the direction of which said work is being, or has been, prosecuted, that labor or materials for the prosecution of such work has been supplied by him or them, and payment for which has not been made, shall be furnished with a certified copy of said contract and bond, upon which said person or persons supplying such labor and materials shall have a right of action, and shall be authorized to bring suit in the name of the United States for his or their use and benefit against said contractor and sureties and to prosecute the same to final judgment and execution: Provided, that such action and its prosecution shall involve the United States in no expense."

It may be stated also that it was a stipulation in each of the contracts with the government that the latter should retain a certain percentage of the contract price until the work was completed, and in case of default by the contractor the government had the right to take possession of the work and plant and prosecute the work to completion. After the contract company had entered into these several contracts with the United States and had given the bonds hereinbefore set forth, and after the work had been proceeded with to some extent, the contract company became largely involved in debt and unable to meet its obligations, and as a consequence, upon the petition of creditors the said contract company, was, by the District Court of the United States for the Northern District of West Virginia, adjudged a bankrupt on the 27th day of February, 1904. At a meeting of the creditors M. J. Bray, C. D. Dotson, and Alfred Heine were chosen as trustees of the bankrupt. The creditors of the bankrupt then set about to make an arrangement by which the trustees of the bankrupt estate might complete the work under the contracts made by the contract company with the United States, but the fidelity and guaranty company objected to such arrangement, unless indemnity was provided by which it would be relieved from liability on the several bonds upon which it was surety. After some negotiations the following agreement was entered into between the United States Fidelity & Guaranty Company and the several banks named therein, to wit:

"Memorandum of agreement, made this eleventh day of April, 1904, between the United States Fidelity and Guaranty Company, a corporation under the laws of Maryland, of the first part, and the City National Bank of Evansville, Indiana, and the First National Bank of Evansville, Indiana, the Citi-

zens' National Bank of Evansville, Indiana, the Second National Bank of Parkersburg, West Virginia, and the Farmers' and Mechanics' National Bank of Parkersburg, West Virginia, the Farmers' Bank of Rockport, Indiana, the First National Bank of Rockport, Indiana, all being corporations, of the second part.

"Witnesseth, that upon the execution and delivery unto the party of the first part by the parties of the second part of a bond of the parties of the second part to indemnify and save harmless the said United States Fidelity and Guaranty Company, from all loss, charge, damage and liability heretofore accrued or hereafter accruing against it by reason of its suretyship or liability on four several bonds executed by the Evansville Contract Company to the government of the United States or to its proper officers on which the party of the first part herein is surety, which bond of indemnity shall be in the aggregate sum of seventy-five thousand ($75,000) dollars, and each of the parties of the second part herein is to be bound thereby to pay such proportion of said sum of seventy-five thousand ($75,000) dollars as the amount of its claim or indebtedness against the Evansville Contract Company bears to the total aggregate of such claims or indebtedness held by them respectively— then, upon the delivery of such bond duly executed the party of the first part herein covenants and agrees as follows:

"First. That the party of the first part will consent to the performance by the trustees appointed in bankruptcy in the District Court of the United States for the Northern District of West Virginia, for the estate and in the matter of the said Evansville Contract Company, bankrupt—of the contracts between the said Contract Company and the government of the United States or its officers in the said bond to be mentioned and set forth.

"Second. The party of the first part will consent to the payment to the said trustees of all moneys accrued and accruing under said contracts in the same manner and to the same extent that the said Evansville Contract Company would be entitled to receive the same if it had continued its business and had continued to perform the said contracts.

"Third. The party of the first part will consent that under the orders of the said bankrupt court the said trustees may borrow money and issue trustees' certificates therefor, to such an amount as the court may authorize, and that moneys so borrowed and certificates so issued may be made a first lien upon the assets of the said bankrupt, and the party of the first part agrees generally that it will make and execute such consents, papers and writings as may be required of it as surety by the government, to facilitate and to continue by the said trustees the performance of the business and contracts of said bankrupt and to enable the said trustees to prosecute and to finish such contracts and to enjoy all benefits that may flow therefrom and from the performance thereof.

"Fourth. The party of the first part reserves the right and makes this contract with the understanding that it does not waive its right to collect the premiums on its several bonds as surety for the Evansville Contract Company, and also reserves the right to take such measures as it may be advised for the collection of such premiums, if default is made in the payment thereof."

And thereupon the banks executed the following bond:

"Know all men by these presents: That we, the City National Bank of Evansville, Indiana, the Citizens' National Bank of Evansville, Indiana, the Second National Bank of Parkersburg, W. Va., the Farmers' & Mechanics' National Bank of Parkersburg, W. Va., the Farmers' Bank of Rockport, Indiana, the First National Bank of Rockport, Indiana, all being corporations, are held and bound unto the United States Fidelity and Guaranty Company, a corporation existing under the laws of the state of Maryland, in the aggregate sum of seventy-five thousand ($75,000) dollars, and each of the said obligors binds itself severally and not for any other person, to pay such proportion of said sum of seventy-five thousand ($75,000) dollars as the amount of its claim or indebtedness against the Evansville Contract Company bears to the total aggregate of such claims or indebtedness, as shown below.

"Sealed with our seals and dated this fourth day of April, 1904.

"The condition of the obligation is such that whereas, the Evansville Contract Company, a corporation under the laws of Indiana, and a debtor to

above obligors, has entered into four several contracts with the government of the United States, through its appropriate officers, and the said Evansville Contract Company has given bonds for the performance of said contracts and for the payment of all persons supplying labor or materials in the prosecution of the work provided in said contracts, on each of which bonds, the United States Fidelity and Guaranty Company, is surety, which bonds are more particularly described. as follows:

"(1) Bond executed September 19, 1903, in the penalty of fifty thousand ($50,000) dollars, covering contract for building dam No. 3 in the Ohio river at Coraopolis, Pennsylvania.

"(2) Bond executed November 21, 1904, for ninety thousand ($90,000) dollars, covering building of dam No. 18 in the Ohio river near Parkersburg, West Virginia.

"(3) Bond executed October 2, 1902, for thirty thousand ($30,000) dollars, covering building of dam in the Congaree river, at Columbia, South Carolina.

"(4) Bond executed November 13, 1900, for thirty thousand ($30,000) dollars, covering building of dam No. 2 in Big Sandy river, Kentucky.

"A copy of each of said bonds is herewith filed as part hereof.

"And whereas, after the work had been commenced under each of said several contracts, and partially completed, an order was made in the District Court of the United States for the Northern District of West Virginia, on the 27th day of February, 1904, adjudging the Evansville Contract Company to be a bankrupt, and

"Whereas, on the 15th day of March, 1904, M. J. Bray, Alfred Heine and C. D. Dotson, were appointed trustees of the said Evansville Contract Company, in bankruptcy, and

"Whereas, at a meeting of the creditors of said bankrupt, it was, on petition of said trustees, ordered, among other things, that the trustees should be authorized to conduct the business of the Evansville Contract Company and to finish the contract theretofore undertaken by the said bankrupt, and for that purpose to borrow money in amount not exceeding seventy-five thousand ($75,000) dollars, and to issue trustees' certificates therefor, and

"Whereas, the undersigned creditors of said bankrupt believe it to be to the interest of the creditors that such contracts be finished by said trustees, and that moneys be borrowed by the trustees according to the order or decree of the bankrupt court, and the United States Fidelity and Guaranty Company is unwilling that that course should be taken unless it be indemnified against any liability that has accrued, or may accrue, to it by reason of its being a surety on each of the bonds above mentioned.

"Now, therefore, if the above obligors shall and will in all respects indemnify and save harmless the said United States Fidelity and Guaranty Company from all loss, charge, damage, and liability heretofore accrued, or hereafter accruing, against it by reason of its suretyship, or liability, on said bonds, and on each of them, then this obligation is to be void; otherwise to remain in full force and virtue."

The debt and claims referred to in this bond, for the purpose of reckoning the proportion above mentioned, are as follows:

| | |
|---|---|
| The City National Bank of Evansville, Ind.................$ | 5,000 00 |
| The First National Bank of Evansville, Ind.................. | 24,000 00 |
| The Citizens' National Bank of Evansville, Ind.............. | 24,000 00 |
| The Farmers' & Mechanics' National Bank of Parkersburg, W. Va........................................ | 20,000 00 |
| The Second National Bank of Parkersburg, W. Va........... | 25,000 00 |
| The Farmers' Bank of Rockport, Ind....................... | 10,000 00 |
| The First National Bank of Rockport, Ind.................. | 7,000 00 |
| | $115,000 00 |

In pursuance of the order made by the referee, the trustees took charge of the work under the contracts which the contract company had with the United States and prosecuted and completed the same, and received from the government the contract price therefor. On or about the 19th of December, 1905, after the trustees had completed all of the contracts, had sold the bankrupt's property and collected all assets, they filed a report with the referee

that the amounts received from the government and from the sale of the plant and property of the bankrupt, after deducting disbursements, left the sum of $36,602.96, subject to allowance for cost of administration thereafter to be determined. It further appeared from the report that the operations of the trustees had not resulted in profit, and that the funds in their hands would not pay the debts. The funds belonging to the estate as above stated were deposited in the Second National Bank of Parkersburg, W. Va., and in the Farmers' & Mechanics' National Bank of Parkersburg, W. Va., one-half thereof being deposited in each of the said banks, where it still remains. In the course of the proceedings Heine, one of the trustees, died, Dotson, another trustee, resigned, and M. J. Bray was in March, 1906, appointed sole trustee of the bankrupt estate.

Jacob Eichel, a citizen and resident of Indiana, was president of the Evansville Contract Company, and, after the arrangement was entered into and the order made by the referee for the trustees to continue work under the contracts, said Eichel was employed to superintend the work, and acted in this capacity until the work was completed. A number of claims for material furnished to the contractor and for labor performed in the construction of the work under the government contracts, before the adjudication in bankruptcy, were presented to the referee, and he on November 19, 1904, entered a decree establishing the following as preferred claims in the distribution of bankrupt's estate:

| | |
|---|---:|
| D. A. Rardin, Athens, O. | $ 327 00 |
| Duncan & Porter Co., Allegheny, Pa. | 460 00 |
| Riter-Conley Co., Pittsburg, Pa. | 4,858 25 |
| The Parkersburg Mill Co., Parkersburg. W. Va. | 5,005 59 |
| The Monongahela River Consolidated Coal & Coke Co., Pittsburg, Pa. | 4,582 98 |
| Pittsburg Trolley Pole Co., Pittsburg, Pa. | 634 20 |
| The Nicola Brothers Co. | 1,199 77 |
| C. D. Dotson, Parkersburg, W. Va. | 2,084 08 |
| C. C. Martin & Co., Parkersburg, W. Va. | 372 15 |
| The Variety Iron Works, Cleveland, O. | 7,348 00 |
| E. L. Oles. | 148 20 |
| Southeastern Lime & Cement Co. | 2,806 00 |
| Clydesdale Stone Company, Pittsburg, Pa. | 6,185 35 |
| Withers & Van Devender, Parkersburg, W. Va. | 3,000 00 |
| E. K. Neale, Ben Lomond, W. Va. | 1,045 50 |
| Lombard Iron Works, Augusta, Ga. | 2,107 82 |

The total amount of said claims, as will be seen, being.....$42,164 89

On the 12th of December, 1904, Phillip W. Frey served notice upon M. J. Bray, the trustee, that he was the owner by assignment of all of the above-mentioned claims except one of $4,858.25 due to the Riter-Conley Company of Pittsburg, Pa., and directed the trustee to pay from the assets of the bankrupt in his hands certain notes given by the said Frey to the City National Bank of Evansville, Ind., to which the aforesaid claims were attached as collateral, and also to pay to the said bank one-half of the remainder due upon the said claims after the discharge of the notes aforesaid. It appears further from the record that, before the trustee had complied with this direction, Laura Eichel, the wife of Jacob Eichel, became the owner of the claims held by Frey, the total of which being $35,663.82, and that she bought the same at a discount, paying $27,037.39 therefor. In order to raise the money to purchase these claims, Laura Eichel borrowed from M. J. Bray $27,037.39, and gave a note to the said Bray for this amount on December 31, 1906, payable on demand at the City National Bank of Evansville, Ind., to bear interest at the rate of 3 per cent., payable semiannually, the said note being signed by the said Laura Eichel and her husband, Jacob Eichel. In connection with this transaction, it was agreed that, as the said Bray had furnished Laura Eichel the money to buy the claims and had loaned it to her at the low rate of 3 per cent. interest, he, the said Bray, was to retain one-half of the excess paid upon the said claims over and above the amount of the note which had been given to him for the money as above stated. It further appears in the record that on the

3d of February, 1906, the United States Fidelity & Guaranty Company, the complainant in the present action, filed a petition in the bankruptcy matter of the Evansville Contract Company pending in the District Court of the United States for the Northern District of West Virginia and before George W. Johnson, referee.

In this petition is recited in substance the execution of the several bonds as surety for the Evansville Contract Company for the performance of the contracts, together with the condition of the said bonds, also that petitioner believes that several persons have supplied labor and materials in the prosecution of the work provided for in each of the contracts, and that the holders and owners of claims on that account have proved the same in the bankruptcy matter, but that petitioner does not know the facts in regard thereto, nor the names of the holders of such claims, nor the amounts to which they are actually entitled constituting a liability on petitioner's bonds as surety. The petitioner also recites the agreement of indemnity referred to before made by the contract company in connection with the execution of the said bonds. It is further set out in the petition that the petitioner acquired a lien by the terms of the indemnity upon the plant and property of the bankrupt about each of the several works included in the contracts, and also a lien upon all funds and moneys earned by or arising from the said contracts in the hands of the government and due and owing under the said contracts; that each of these liens was in existence at the time of the adjudication in bankruptcy, and still continues so far as may be necessary for the indemnity of the petitioner upon any and all liabilities whatever arising upon each and all of said bonds. The petition proceeds further to allege that after the bankruptcy the agreement allowing the trustees to proceed with the work was made, and that in order to indemnify the petitioner against loss by reason of its suretyship the bond was executed by the banks, as before stated, and, further, that the trustees proceeded with the work and completed it, and that they had in hand as a net result of proceeds of the work and sale of the property in December, 1905, about $36,000. The petition further refers to the decree establishing the preference of claims for labor and material as hereinbefore set out, and says that petitioner does neither affirm nor deny the correctness of any one of said claims, and reserves the right to attack or defend against each and all of them, if so advised, in case any demand is made upon petitioner on account thereof or in case any recourse is sought by any of them upon your petitioner's bonds. The petitioner then insists that the whole amount of money in the hands of the court will not be sufficient to satisfy the claims of the class referred to, and that petitioner has a lien on all of said funds for its indemnity, and is advised that equity will protect such lien. The petition further alleges that petitioner is advised that it is entitled to intervene and assert the lien on the fund in the hands of the court and require that the fund in the court's hands shall be applied to the satisfaction of the debts and claims against the bankrupt for which the petitioner is liable, and that petitioner is also entitled to obtain the protection of the court for its right, and also for the protection of the several banks which signed the bond of indemnity. The prayer of the petition was that petitioner be permitted to file it, and that the trustees, together with the several banks named, be made parties defendant, and that the rights and lien of the petitioner be respected and enforced upon the funds in the hands of the trustees and under the control of the court; that the court ascertain what persons hold claims for materials furnished and labor performed in the prosecution of the several contracts, and what persons are entitled to enforce any liability upon any of the bonds executed by petitioner; that the court ascertain the amount of such claims, and cause the funds in the hands of the court to be applied upon such claims and in satisfaction thereof, etc.

About this time a man by the name of John G. Eigenmann filed notice with the trustees objecting to the order of the 19th of November, 1904, entered by the referee, preferring the claims for labor and materials, and the trustees filed their petition with the referee asking that the said decree should be reopened, and that the claims theretofore preferred should be re-examined and the facts in regard thereto inquired into. Thereupon the referee, on the 12th day of February, 1906, entered an order that the said claims be re-ex-

amined, and instructed the trustees to file the necessary pleadings to raise the question as to whether or not the claims heretofore allowed are properly preferred claims, and for the re-examination and consideration of the said claims. It appears, however, that on September 11, 1906, Eigenmann withdrew his opposition to the preference of these claims in the distribution of the bankrupt estate. About this time suits were brought upon a number of these claims in the Circuit Court of the United States for the Western District of Pennsylvania, and suits were brought upon others in the court of common pleas, Allegheny county, Pa. These suits, all of which were brought under the provisions of the second paragraph of the act of August 13, 1894, are styled as follows:

"United States of America, for Use of [here giving the name of the original owner of the claim], Then for the Use of Phillip W. Frey, and Now for the Use of Laura Eichel, v. United States Fidelity & Guaranty Company, a Corporation."

These suits were pending in the Circuit Court of the United States for the Western District of Pennsylvania and also in the state court aforesaid, and some of them were at issue and ready for trial when on the 21st day of September, 1907, the United States Fidelity & Guaranty Company presented its petition to the District Court of the United States for the Northern District of West Virginia in the Matter of the Evansville Contract Company, Bankrupt, and moved the court to be allowed to file a bill (which accompanied the petition) in the Circuit Court of the United States for the Northern District of West Virginia against M. J. Bray and other persons named in the petition, whereupon the said District Court on the said date made the following order:

"Upon consideration whereof it is ordered, adjudged and decreed that leave and permission be and are granted unto the United States Fidelity & Guaranty Company to file such bill in the Circuit Court of the United States for this district, and that the same shall not be deemed to be in contempt or derogation of the powers and jurisdiction of this court, but rather as ancillary thereto."

Thereupon on the 21st day of September, 1907, the United States Fidelity & Guaranty Company filed on the equity side of the docket in the Circuit Court of the United States for the Northern District of West Virginia a bill of complaint which is the basis of the present controversy.

The bill sets out substantially many of the facts contained in the foregoing statement, particularly that the contract company had entered into the four several contracts mentioned; the agreement of indemnity executed by said company to the complainant; the fact that complainant executed the several bonds described and conditions thereof; that the contract company undertook the work and failed, and was adjudged bankrupt; that the bond of indemnity was given by the banks to complainant to the end that the trustees might complete the work under the contracts; that the work was completed, and, after receiving the price from the government and making a sale of the bankrupt's property, there was in the hands of the trustees about $36,000. Upon this amount complainant claimed a first lien to the extent that it might be liable for claims due for materials and labor furnished the contract company.

The bill further charges that complainant is informed that claims of this character were outstanding at the time of bankruptcy to the amount of about $40,000, but that all of said claims had been bought up by Phillip W. Frey, the general counsel of the trustees in bankruptcy, and in conjunction with M. J. Bray, trustee, and Jacob Eichel, and that the three persons named had colluded and conspired together in violation of their fiduciary and trust relations and had acquired these claims (the same being all the labor and material claims due from the contract company, except two, one due the Riter-Conley Company and the other due the Nicolette Lumber Company) at a large discount, and that the said claims had, by showing which these parties made before the referee upon the testimony of Jacob Eichel and Alfred Heine, been adjudged as preferred in the distribution of the bankrupt's estate.

The bill further charges that these three parties, namely, Frey, Bray, and Eichel, had by conspiracy and collusion been instrumental in fixing the claims

which they had bought as entitled to the first payment out of the assets of the bankrupt, etc.

The bill further charges that Laura Eichel was only a figurehead in the purchase of the claims, and that Jacob Eichel, Bray, and Frey were the parties really in interest. It is also stated in the bill that the Farmers' & Mechanics' National Bank and the Second National Bank of Parkersburg, W. Va., had sold their respective claims of $20,000 and $25,000 to Jacob Eichel at a large percentage of their face, etc.; that this sale affected the profits which were expected to accrue from the completion of the contracts by the trustees; also that Eichel had acquired in his own name, or that of his wife, the claims of all the other banks which executed the indemnity bond of April 4, 1904; that the First National Bank of Evansville had gone into liquidation, and that the security of the complainant on the indemnity bond is being endangered thereby, and that Eichel had agreed to indemnify the First National Bank and the Citizens' National Bank representing $48,000 of the $115,000 shown as the indebtedness of the contract company to the banks which signed the indemnity bond; that Bray had contracted to indemnify the First National Bank of Evansville against liability on the said bond; and that all of the banks which signed the bond had in some way been indemnified against liability except the Second National Bank and the Farmers' & Mechanics' National Bank of Parkersburg, W. Va.

The bill further charges that Bray, Frey, and Eichel purchased the material claims because of an understanding and combination as aforesaid, and at the time when they intended that the same would be paid first and in preference to all others. Also charges the pendency of the suits in the courts in Pennsylvania.

The complainant then insists that each of the banks named had the benefit of their contract, and each of them is bound and estopped to deny its proportion of liability according to the terms of the bond; that the net funds in the hands of the trustees after the payment of premiums due complainant and such unadjusted costs should first be applied to the satisfaction of whatever claims have the right of recourse against complainant as surety on the bonds of the contract company; that no claims held by M. J. Bray or Jacob Eichel or Laura Eichel, or by any agents, servant, or attorney of theirs, shall be paid in an amount in excess of the sum actually expended therefor.

In addition to these, the prayer of the bill is that an accounting be had to the end that the court may ascertain what claims are proper charges for material furnished under the contracts; that each of the banks which signed the bonds is interested in the application of the funds in the hands of the trustee for the satisfaction of the claims for which complainant is liable, and for that reason the said banks should be made parties defendant; that without the interference of the Circuit Court litigation and controversy with regard to the subject-matter of the bill would result in a multiplicity of suits and a grievous wrong and hardship to complainant; that the District Court in bankruptcy has not settled and adjusted any such matters, and has no jurisdiction or means to apply the requisite remedies to administer complete justice in one comprehensive suit, and that complainant is remediless without intervention of the Circuit Court, and therefore the further prayer is that the court take full jurisdiction of all the persons and parties and administer complete justice between them, that the writ of injunction be issued directed against Jacob Eichel, M. J. Bray, and Laura Eichel to enjoin them from instituting, prosecuting, or maintaining any action or suits before mentioned pending in the state or district of Pennsylvania, and from instituting any action or actions against complainant on account of any claim or claims arising out of its suretyship on any of the bonds given as surety for the contract company, and, further, that the complainant be relieved from all liability on the said bonds by the application of the funds in the hands of the trustee and by the parties to the contract of indemnity of April 4, 1904, and that complainant is entitled to all the rights and remedies that the parties hereto or any of them have against each other for indemnity or contributions.

The complainant made defendants in its bill M. J. Bray, trustee, Jacob Eichel, and Laura Eichel, all of whom are citizens and residents of the state

o: Indiana, the City National Bank of Evansville, Ind., the Citizens' National Bank of Evansville, Ind., the First National Bank of Evansville, Ind., the First National Bank of Rockport, Ind., all national banking associations located in the respective towns named, and being citizens and residents of the state of Indiana, the Second National Bank of Parkersburg, W. Va., the Farmers' & Mechanics' National Bank of Parkersburg, W. Va., banking associations under the laws of the United States located in the city of Parkersburg, W. Va., and citizens and residents of the state of West Virginia in the Northern district thereof; the Farmers' Bank of Rockport, Ind., a corporation under the laws of the state of Indiana, and as such a citizen and resident of the state of Indiana, the Riter-Conley Company, a Pennsylvania corporation doing business in the city of Pittsburg, a citizen and resident of the state of Pennsylvania, and the Nicolette Lumber Company, a corporation under the laws of the state of West Virginia and a citizen and resident of the said state.

Upon the filing of complainant's bill a writ of subpœna was granted and a temporary restraining order was issued enjoining M. J. Bray, Jacob Eichel, and Laura Eichel from prosecuting any suit or action against the United States Fidelity & Guaranty Company upon any claims mentioned in the bill upon which suits had been brought in the court of common pleas. Allegheny county, Pa., or in the Circuit Court of the United States for the Western District of Pennsylvania, and from instituting any suit or action upon any such claims. The 19th of November, 1907, was designated by the court as the date for hearing the motion for permanent injunction. On the return day the defendants demurred to the bill. The demurrers were overruled, and the injunction against Bray, Jacob Eichel, and Laura Eichel was made permanent. Thereupon the defendants, with the exception of the Riter-Conley Company and the Nicolette Lumber Company above named, appealed to this court.

William M. Hall and J. A. Dupuy (V. B. Archer, on the briefs), for appellants.

B. M. Ambler (Van Winkle & Ambler, on the briefs), for appellees.

Before PRITCHARD, Circuit Judge, and WADDILL and BOYD, District Judges.

BOYD, District Judge (after stating the facts as above). The facts in this case are given at length and in detail to the end that the entire controversy between the parties may be clearly presented, and thus enable us to more readily determine such question of law as may be necessary to dispose of the appeal. Although there are many propositions discussed by counsel, we think the only question to be decided in order to dispose of the case here is that of jurisdiction, and it is our opinion that the Circuit Court did not have jurisdiction to entertain complainant's bill.

If otherwise complainant had the right to assert a lien upon the property of the bankrupt contract company, such right could not be availed of by a suit in the Circuit Court, the object of which was to reach and determine priorities in the distribution of assets in the custody of the bankrupt court. Practically the effect of complainant's suit in the Circuit Court is to stay proceedings in the matter of the Evansville Contract Company, bankrupt, in the District Court, and to undertake to determine priorities or preferences in an estate in the custody and control of the latter court. This the Circuit Court is not empowered to do, for the jurisdiction of the District Courts in bankruptcy in this respect is original and exclusive.

Complainant's counsel insist that, as the fund sought to be subjected to the complainant's lien is within the territorial limits of the district, jurisdiction of the Circuit Court therefore attaches; but this fund which constitutes the res in this case is the estate of the bankrupt in the hands of the trustees, and in our opinion property or funds in custodia legis under the orders and decrees of a court of competent jurisdiction cannot be made the basis of jurisdiction in another court in an effort to establish liens upon such fund or property or otherwise deal with it. The District Court sitting in bankruptcy having this entire fund in custody and having complete jurisdiction to administer it, the Circuit Court has no power by its decree or order to interfere with it, nor is this want of power supplied by the order of the District Court permitting complainant's bill to be filed, for, if the Circuit Court was without jurisdiction, the District Court is not authorized to confer it.

The bankruptcy act provides (Act July 1, 1898, c. 541, § 2, 30 Stat. 545, 546 [U. S. Comp. St. 1901, pp. 3420, 3421]), that:

"The District Courts of the United States * * * are hereby made courts of bankruptcy, and are hereby invested, within their respective territorial limits as now established, or as they may be hereafter changed, with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings, in vacation, in chambers and during their respective terms, as they are now or may be hereafter held."

And, among the powers specifically mentioned, to—

"allow claims, disallow claims, reconsider allowed or disallowed, and to allow or disallow them against bankrupt estates."

And in the section conferring specific power on the bankruptcy court it is enacted:

"Nothing in this section contained shall be construed to deprive a court of bankruptcy of any power it would possess were certain specific powers not herein enumerated."

Mr. Loveland in his work on Bankruptcy (2d Ed.) p. 70, commenting on this last clause, says:

"It was evidently the intention of Congress to establish a complete system of bankruptcy proceedings, and to confer on the courts of bankruptcy, constituted by the act, special jurisdiction over the whole subject and extending to all matters, acts and things to be done under and in virtue of bankruptcy."

In view of the provisions of the bankrupt act and the decisions which are many relating to its construction, the conclusion is irresistible that it is the province of the bankrupt court to administer the funds held by it in a proceeding in bankruptcy, and, as was said by this court in New River Coal Land Company v. Ruffner Bros. (C. C. A.) 165 Fed. 881:

"The powers of the District Court in bankruptcy are ample to administer an estate with due regard to priorities or vested liens, and to protect all interests in such estate, whether they be legal or equitable."

What was said by this court in that case is substantially a reiteration of the law as laid down by the Supreme Court of the United

States in Whitney v. Wenman, 198 U. S. 539-552, 25 Sup. Ct. 778–781, 49 L. Ed. 1157.

It is not necessary to consider any other of the various questions presented by the assignments of error and argued by counsel. Our opinion being that the Circuit Court was without jurisdiction, the demurrers to the bill should have been sustained. The refusal to do this was error, and it was also error to grant the injunction. The decree of the Circuit Court is therefore reversed, and the case will be remanded to the end that the injunction granted may be dissolved and complainant's bill dismissed.

Reversed.