UNITED STATES FIDELITY & GUARANTY CO. v. EICHEL et al.

(Circuit Court of Appeals, Third Circuit. February 3, 1915. Rehearing Denied February 18, 1915.)

No. 1850.

1. PRINCIPAL AND SURETY ⬤⇒112—CONTRACTOR'S BONDS—ACCEPTANCE OF NOTES.

The liability of the surety on a contractor's bond conditioned for the payment of laborers and materialmen was not affected by the acceptance of notes for the amount of claims for labor and materials, or by the proof of the notes, instead of the open accounts, in a bankruptcy proceeding against the contractor, as, it not appearing that the notes were given in payment, they would be regarded merely as security.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 226–234; Dec. Dig. ⬤⇒112.]

2. PRINCIPAL AND SURETY ⬤⇒113—APPLICATION OF PAYMENTS.

Where a contractor indebted to the C. Company for materials furnished for use on three different contracts, for the performance of only two of which plaintiff was the contractor's surety, made payments from time to time without any application thereof being made by either party at the time, the C. Company, after the contractor had become bankrupt, and two years after the payments had been made, had no right to apportion such payments between the several contracts, as a debtor, in making payments, may apply them to whichever debt he may select, and if he makes no selection the creditor has the right of application, but, if neither acts at the time of payment, the law, in the absence of special equities, applies the money to the oldest debt.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 235–239; Dec. Dig. ⬤⇒113.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PRINCIPAL AND SURETY ☞66—EXTENT OF LIABILITY—PURCHASE OF CLAIMS
   AT DISCOUNT.
     Equity cannot sanction the conduct of the president and manager of a
   contracting company, his wife, its trustee in bankruptcy, and the trustee's
   attorney, in buying claims against the company at a discount, the trustee
   to share in the profits of the transaction, and they could recover against
   the contractor's surety only the sum actually paid by them, and not the
   face value of the claims.
     [Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§
   108–110, 112; Dec. Dig. ☞66.]

Appeal from the District Court of the United States for the Western
District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the United States Fidelity & Guaranty Company
against Laura Eichel and others. From the judgment, complainant ap-
peals. Reversed, with instructions.

William E. Schoyer, of Pittsburgh, Pa., for appellant.
William M. Hall, of Pittsburgh, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit
Judges.

J. B. McPHERSON, Circuit Judge. This controversy has become so
intricate that we cannot dispose of it as briefly as we should like. But
we shall try to condense the facts as much as possible.

The transactions to be summarized began more than ten years ago,
when the United States Fidelity & Guaranty Company became surety
on several bonds given to the government by contractors on public
works. On these bonds—all of which contained the usual condition
that the principal would pay laborers and materialmen promptly and
in full—the Evansville Contract Company was originally liable as prin-
cipal, or afterwards became liable. On February 27, 1904, the Contract
Company was adjudged bankrupt in the Northern District of West Vir-
ginia, and three trustees were appointed—one of them, Madison J.
Bray, afterwards becoming sole trustee. Our principal concern is with
his conduct, and no attention need be paid to his cotrustees. His at-
torney during the period chiefly in question was Philip W. Frey, and
his conduct also is attacked. So, too, is the conduct of Laura Eichel
and of her husband, Jacob Eichel; Jacob having been a large stock-
holder, as well as the president and general manager, of the Contract
Company, and having carried on the company's business for the trus-
tees after the adjudication.

The suit now before us is in equity, and was brought under the fol-
lowing circumstances: Within about a year after the adjudication,
Bray, Frey, and the Eichels bought, or caused to be bought, at a dis-
count certain claims for materials that had been furnished to the bank-
rupt under the contracts upon which the Guaranty Company was sure-
ty. Ultimately these claims were all assigned to Laura Eichel, and she
brought 18 separate suits thereon against the Guaranty Company, first
in a court of the state of Pennsylvania, and afterwards in the United
States District Court for the Western District. The latter suits were
brought to November term, 1907, but a final determination was delayed

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for several years. In October, 1912, while they were still pending, a bill in equity was filed against Laura Eichel, Jacob Eichel, Madison J. Bray, and Philip W. Frey. The service on Jacob Eichel was set aside, but the suit proceeded against the others. The bill asserted, inter alia, that the Guaranty Company had equitable defenses to some of the suits at law, but could not set them up in those actions, and for this reason, as well as to prevent a multiplicity of suits, the company prayed the court to take jurisdiction of all matters in controversy between the parties, and in the end to determine what amount, if any, the Guaranty Company was liable to pay because of its suretyship. There was no doubt that the Company was liable to some extent, but the precise amount depended upon the solution of several disputed questions. Without further reference to the pleadings or to the regularity of the proceeding, it will be enough to say that the defendants acquiesced in this prayer, and that testimony was taken and a hearing had upon the merits; the final result being, that the district court entered a decree against the Guaranty Company in favor of Laura Eichel for the face of the claims sued on—$59,769.08—with interest. From this decree the present appeal is taken, and the Guaranty Company contends that (while it is liable in some amount) its maximum liability is the amount paid for the claims by the defendants, and its true liability is much smaller.

For the moment we shall disregard what was done in West Virginia, and shall confine ourselves to the suit in the Western District of Pennsylvania, in order to decide two questions of minor importance.

[1] The Guaranty Company set up as a defense to seven of the claims sued upon—Nos. 42, 44, 45, 51, 52, 54, and 55 of November term, 1907—that the claimants had already been paid either in whole or in part because they had received certain promissory notes from the Contract Company. These notes, however, are still unpaid, and we agree with the court below that they were neither given nor accepted in payment, and therefore, under familiar principles, are to be regarded merely as security. Neither do we think it material that these notes were proved in the bankruptcy proceeding as the foundation of the creditors' claims either in whole or in part. In substance, the claims were precisely the same as if the creditors had proved upon their open accounts, for there was certainly no doubt about the character and standing of these notes. We think the subject needs no further attention.

[2] The other question has to do with the application of certain payments that had been made by the Contract Company to the Clydesdale Stone Company, two of whose claims are sued on at Nos. 24 and 25, November term, 1907. One of these claims is for material furnished between October 4 and November 20, 1901, upon a particular contract, and the other claim is for material furnished between November 8, 1901, and June 18, 1902, upon another contract. Upon both of these contracts the Guaranty Company was surety, and was therefore liable for the amount properly due upon both of the claims. How much is due is the point in dispute, and the question arises in this way: From time to time the Contract Company made payments to the Stone Company on open account, no application of these payments being

made by either party at the time. This, of course, would make no difference, if these two claims comprised the whole indebtedness of the Contract Company to the Stone Company; but there is a third claim for materials that were furnished from October, 1902, to July, 1903, on a third contract upon which the Guaranty Company is not a surety, and therefore it may (and probably does) make a difference to the Guaranty Company upon which portion of the open running account the general payments made by the Contract Company should be applied. This account embraced the materials furnished upon the three contracts, and it appears that what was actually done with the Contract Company's payments was this: On July 1, 1904, several months after the bankruptcy, the Stone Company assigned its whole claim to Frey, and at that time undertook to apply the payments that had previously been made, distributing them (in the words of the court below) "by proper apportionment to the several contracts." This application was sustained on the ground that, "so far as appears, no surety of the bankrupt will be required to pay more of the Stone Company's account against the bankrupt than may be properly required of it." This may perhaps be true, although it does not certainly appear; but the difficulty is that the Stone Company had no right to make the application. The general rule on this subject is well known. The debtor, who is paying his own money, may apply it to whichever of his debts he may select. If the debtor makes no selection, the creditor has the right of application. If neither acts at the time of payment, the law applies the money to the oldest debt. Special equities may require special treatment, but the general rule requires the application just stated. No special equity appears in the present case. Probably there was a surety on the third contract, but he is not in court, and we are left to conjecture what special claim to consideration he might be able to present. But, aside from this, the Stone Company had no right to make a nunc pro tunc application two years after the payments had been made, and several months after the principal debtor had gone into bankruptcy. The rights of creditors against the estate had been fixed, and the Stone Company could not change them. In this respect therefore the decree needs to be modified, although we must leave the details to the district court.

[3] Let us now turn to what was done in West Virginia. We should extend this opinion unduly if we set out the numerous facts in detail; and to do so would be needless repetition, for elaborate statements have already been made by the Court of Appeals for the Fourth Circuit in Bray v. Fidelity, etc., Co., 170 Fed. 689, 96 C. C. A. 9, and by the Supreme Court in an affirming opinion reported in 225 U. S. 205, 32 Sup. Ct. 620, 56 L. Ed. 1055. We shall content ourselves therefore by referring to these statements with the same effect as if we repeated them in full. It is sufficient to say here that these decisions settled the following proposition: That the bankruptcy court in West Virginia had exclusive jurisdiction to determine whether the foregoing claims, which had then been sued upon in Pittsburgh, and had also been allowed by the referee in bankruptcy as preferred claims, should be re-examined, and (if re-examined) whether the holders thereof—namely, Bray, Frey, or the Eichels—had a right to have them rated

and paid at their face value as preferred; and to determine also whether Bray, as "trustee, and others who were employed to assist him in the management of the estate [had] been speculating in claims against it and procuring or acquiescing in their improper allowance and classification." United States Fidelity & Guaranty Co. v. Bray, 225 U. S. 218, 32 Sup. Ct. 625, 56 L. Ed. 1055.

In the exercise of this exclusive jurisdiction the bankruptcy court took the following steps: On January 4, 1913, eight months after the decision of the Supreme Court, the referee made an order distributing all the assets of the bankrupt estate, and awarding to the preferred claims (which could not be paid in full) a dividend of 66⅔ per cent. He did not calculate this percentage on the face of the claims, but on the amount that had been paid for them by Bray, Frey, or the Eichels, giving the following reasons for his conclusion:

"Now, as to the purchase of the so-called preferred claims by Jacob and Laura Eichel, I am of the opinion that, under the circumstances, they had no right to engage in this transaction with a view of making a profit, and that these claims should be allowed for the amount at which they were purchased, and not for their face. Jacob Eichel was a heavy stockholder in the Evansville Contract Company, was a member of the board of directors, and president of the company—in fact, was the active head and manager. While the Company was a going concern and in active business, no one will contend that he, while president, or holding any other office in the corporation, could have legally bought up claims against his company for the purpose of making a profit on them. He would have had a right to purchase claims against his company, even at a discount, but the company, and not he, would be entitled to the profit. The fact that his company had gone into bankruptcy did not change his position. He was not only still president of the company, but was in the employ of the trustees of the bankrupt. It was to him they had to look for information concerning the past business transactions of the corporation; perhaps it was to him they had to look for information concerning the correctness or the incorrectness of these very claims. Under our law, as I understand it, an agent, the officer of a corporation, or a person occupying any position of trust or trust relationship, such as trustee, special commissioner, executor, or administrator, has no right to deal or barter for profit in the business or property of his principal, corporation, cestui que trust, decedent, or estate that he represents; and, if he does to the disadvantage of the person or interests he represents, the transaction will be held to be void; and, on the other hand, if the transaction turns out advantageously, the profits will inure to the benefit of the principal, corporation, cestui que trust, estate, property, or business he represents. What is here said concerning the position of Jacob Eichel applies with equal force to M. J. Bray and Philip W. Frey. Mr. Bray was and is the trustee of the bankrupt corporation, and Mr. Frey was one of the attorneys of the trustee at the time these claims were purchased by him, as the agent of Mrs. Laura Eichel. It is said that Mr. Bray was not interested in these claims at the time of their purchase, but became interested afterwards. However this may be, the evidence shows that it was his credit that obtained the money with which they were purchased, and that the claims were held as collateral security for this money, not merely to protect the bank, because it was amply protected and secured by the indorsement of Mr. Bray, but they were held for the protection of the latter. It is shown by the testimony of Mr. Bray himself that he carried the claims on his private account book as the 'Frey Accounts,' and that he is to have one-half of the profits arising from the transaction. Mr. Frey, as already stated, while acting as the agent of Mrs. Laura Eichel in the purchasing of these claims, was, at the same time, one of the attorneys for the trustees. As such attorney, it might have become his duty to advise the trustees relative to the validity of, or the amount justly due and owing on, these very claims. In case of litiga-

tion over them, it would have been the duty of Mr. Frey to represent the trustees, and through them the bankrupt estate, and it is not at all hard for one to imagine a situation where the interest of the client would be directly opposed to the interest of the attorney, if Mr. Frey is permitted to purchase these claims for Mrs. Eichel, and at the same time have an interest in the profits. I do not mean to intimate that these parties were guilty of anything dishonest, or that they ever anticipated taking advantage of the situation which they occupied in relation to these claims, or the position of trust which they held, but no court of justice should, with its sanction, permit men to occupy a position so exposed to temptation, nor countenance such an opportunity for one man to wrong another. No man can well serve two masters, especially when the interests of those two masters conflict, and therefore the law does not encourage nor countenance the attempt.

"Charges of fraud and collusion are made against the parties interested in the purchase of these claims, and especially against Mr. Bray, the trustee, but they are not sustained by the evidence; in fact, there is no evidence in this record, according to my opinion, even tending to prove it, and it is not upon that theory that I have arrived at the conclusion herein set forth, but because the law forbids such transactions, no matter how free they may be from the taint of fraud, and if the trustee's connection with the purchase of these claims justified suspicion, the open, manly way in which he has testified and voluntarily offered his private papers and accounts that they might go into the record must convince any one that he was actuated by no impure or dishonest motive. While I cannot uphold his position from a legal standpoint, yet I feel that it is only justice that he, as an officer of the court, should be relieved from the suspicion of dishonesty.

"The contention of Jacob Eichel that he had an understanding with the agent of the Bonding Company that he was to buy up these claims, and that he did it with his consent, does not alter the situation. According to Mr. Eichel's own evidence, the offer or proposition came from himself and the agent, Mr. Wood, only gave a tacit or negative assent; that is, he raised no particular objection. When the question of allowing the trustees to go on with the work was under discussion, some anxiety was expressed lest the Bonding Company might be called upon to make good the unpaid labor and material claims, before the work could be completed and these claims paid off by the trustees in the regular course of business, as every one seems to have thought at that time that there would be plenty of funds to pay all. Then it was that Mr. Eichel said that he would take care of that; he would get control of these claims, and would guarantee that the Bonding Company should never be bothered with them. I would infer from this conversation, as detailed in the evidence, that Mr. Eichel's object was to allay the anxiety of the Bonding Company rather than to make a binding contract whereby he might speculate upon the misfortunes of the surety for the bankrupt company, of which he was the president, and had been the active business manager when it went ashore on the financial rocks and breakers. There was certainly nothing in this conversation, on that occasion, as he gives it himself, to convey the idea that he expected to buy up these claims at 65, 70 or 80 per cent. of their face, and collect 100 per cent. from the surety. It may be sufficient to relieve him of the suspicion of any wrongful intent originally, but it does not relieve him of the duty he owed to his company, its creditors and its surety."

When the matter came before the District Court on a petition to revise, Judge Dayton affirmed the referee's order, but declared the trustee's conduct to be fraudulent in the following opinion, which has not been reported:

"This proceeding in bankruptcy was started in February, 1904, nearly ten years ago. A very careful reading and consideration of this petition to revise and the voluminous record certified in connection therewith has fully convinced me that this unfortunate condition of affairs has largely arisen from two mistakes made in the very beginning: First, in the assumption

that a court of bankruptcy could ever, by and through its trustees or otherwise, undertake to carry out government contracts for the building of river and harbor improvements; and, second, in selecting an utterly dishonest and unscrupulous individual as trustee in the person of M. J. Bray. In extenuation of the first it may be said that it was done by my predecessor at the instance of parties interested, who saw visions of great profits to be derived therefrom, but in the end inevitably were confronted by great losses by reason thereof. As to the second, no one could foresee that, in violation of all obligations, both moral and legal, this trustee in bankruptcy, after assuming to carry out these same contracts, after having utterly failed to realize all hopes of profit on the part of creditors, but, on the contrary, had caused them large loss, could conceive the scheme of still further victimizing these unfortunate creditors. It is clear in this case as anything reasonably can be established that this trustee, Bray, in connection with Jacob Eichel, the president and manager of this bankrupt corporation, entered into a scheme to buy up labor and material claims, entitled to liens upon the bankrupt's property, at enormous discounts, and, through the attorney of the trustee, succeeded in doing so to the extent of an investment therein of $27,-037.39, for $35,663.82 of par value. They, of course, well knew they could not do this in their own names, so they did so in the name of Laura Eichel, the wife of Jacob. She was simply a figurehead—a go-between. Bray furnished the money, and he was to have half the profits of the discount. He and Eichel very carefully saw to it that these claims were proven and decreed to be preferred ones so far as November 19, 1904, and the Surety Company was notified that the money was in hand to pay them and they would be paid. They then stood on Bray's (trustee's) books in the name of Frey, his attorney. This decree of the referee ascertaining the amount and right to preferred payment of these claims has never been appealed from or reversed. The scheme moved so far very smoothly, and likely no discovery would have been made of it had Bray and Eichel been satisfied with the something over $8,000 personal profit derived by them from the discount of creditors' claims, money to pay which in full was in Bray's hands, realized from the sale of plants of the bankrupt of which he was trustee. Their greed and avarice, however, caused them to overreach themselves. Money made in this way came so easy and they wanted more. Thereupon the further scheme suggested itself to them that the bankrupt's surety could be sued upon the indemnity contract, executed by the bankrupt to the government, and made to pay each and all these claims they had thus bought in, and then the fund arising from the sale of the plants, etc., of the bankrupt could be disbursed in payment of unsecured claims for which the surety was not liable. They became interested in such unsecured debts, and started actively, by suits instituted against the surety company in another jurisdiction and state, to seek the recovery from it, on its surety contract, of these preferred claims, so as to permit the fund arising here from the sale of plants, etc., to be disbursed upon the unsecured debts in which they were interested. It needs no citation of authority to support the legal proposition that trustees in bankruptcy are not appointed for the purpose of allowing them to filch and defraud creditors for their own gain, but for the honestly protecting and securing to the creditors every dollar that can be realized for them from the bankrupt's estate. They should be appointed in the beginning from those who are wholly disinterested, and will remain so disinterested until their duties are done and they are discharged. Had my attention heretofore been called to Bray's conduct, he would have been summarily removed from his trusteeship. He would be now removed, if anything more was to be done in this proceeding by him except disburse the funds in his hands, and if the appointment of another trustee was not calculated to cause delay and additional expense.

"Certain it is, however, that in this bankrupt court, where equity is administered, I will allow no technicalities upon their suggestion to prevent the annihilation of this corrupt and fraudulent scheme of his and Eichel's. I therefore heartily concur with the referee's ruling that prevents them from realizing the $8,000 profit from the buying up of these creditors' claims. Nor

will I for a moment interfere with the decree of the referee made nine years ago, ascertaining these preferred claims to be such, at the instance and for the general benefit of this trustee, Eichel, the president and manager of the bankrupt, and their go-between, Mrs. Eichel. It seems to me it is wholly immaterial as to how the knowledge of this fraudulent scheme and conduct has been presented. There is one thing for the court to do, and that is to condemn and defeat it in the promptest and most emphatic way possible, for these trustees in bankruptcy are, in a sense, only the court's agents. I am in absolute and full accord with the referee's rulings in this case, and the decree complained of in this petition to revise will be in all respects affirmed."

On December 7, 1914, the Court of Appeals of the Fourth Circuit affirmed the District Court, 218 Fed. 987, 133 C. C. A. 669, saying in a brief per curiam that it "was unnecessary to repeat the argument in support of these conclusions."

We need not determine whether this decision in the Fourth Circuit bound Laura Eichel under the rule of res judicata. Assuming that she may not be bound, we have considered the evidence independently, and agree with the appellant that Bray, Frey, and the Eichels were parties to a plan to buy the claims at a discount in order that Bray might share in the profits of the transaction; and we agree also that a court of equity cannot sanction such conduct. The court below took a different view, holding that the purchase at a discount was lawful, and that the Surety Company was liable to Laura Eichel for the face value of the claims, instead of for the sum actually paid. In this respect the decree was erroneous and must be corrected.

Without discussing them, we need only add a few words about two other matters. In our opinion, the claims of the Pittsburgh Trolley Pole Company and of Nicola Bros. stand, in substance, on the same footing as the others, and should be allowed against the Guaranty Company only for the amount actually paid for them. And we decline to consider in this proceeding the effect of the counter indemnity given by Bray to two of the Evansville banks to protect them against loss under the indemnity to the Guaranty Company that is referred to in the statements of fact found in 170 Fed. and in 225 U. S. This is a matter with which Laura Eichel had nothing to do, and the decree now under consideration is only determining her right against the Guaranty Company. She is entitled to recover a certain sum from that company, and the amount cannot be diminished by deducting money that Bray may owe to the company under a contract to which she was not a party, and of which (so far as appears) she had no knowledge.

The subjects of interest and of costs in the court below we shall leave for determination by the District Judge in the final adjustment. Our decree will only cover the costs of this appeal.

It is evident from what has been said that the decree appealed from must be considerably diminished, but we are not in a position to state the true amount exactly. Whatever sums have been awarded by the bankruptcy court in West Virginia on account of these claims should, of course, be credited, and such other credits should be given as may be necessary when the claims specially referred to herein are adjusted.

The decree is reversed, with the costs of appeal, and with instructions to enter a decree in accordance with this opinion.