## WHITE v. BARNARD et al.

Circuit Court of Appeals, First Circuit.
November 27, 1928.

No. 2255.

Anderson, Circuit Judge, dissenting.

Albert A. Schaefer, of Boston, Mass., for appellant.

Martin Witte, of Boston, Mass., for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. We are met at the outset by a motion of the appellees to dismiss this appeal on the ground that the appellants never applied to this court for its allowance and this court has not exercised its discretion and allowed the appeal as provided by section 24b of the Bankruptcy Act, as amended May 27, 1926, 11 USCA § 47(b). The appeal appears to have been taken under section 24a, and, if that section is the one applicable in this case, the appeal was properly perfected.

The jurisdiction of this court to allow appeals in bankruptcy matters under section 24b is limited to "proceedings in bankruptcy," as distinguished from "controversies arising in bankruptcy," and includes all "proceedings in bankruptcy," except the three specified instances otherwise provided for in section 25a, 11 USCA § 48(a). Quinn v. Gardner et al. (C. C. A.) 28 F.(2d) 270, 271, and cases there cited.

As the appellants have not petitioned this court for leave to appeal, within 30 days from the rendition of the order or decree of the District Court complained of, the decision of the question of the jurisdiction of this court to entertain the appeal depends upon whether the order sought to be reviewed involved the decision of a question arising in a "proceeding in bankruptcy" or in a "controversy arising in bankruptcy." The order appealed from is one declaring a deed of certain real estate given by the bankrupt, Norman H. White, to Herbert H. White, as security for certain loans made by Herbert to Norman, invalid. It is therefore appar-

ent that the issues presented involve a controversy between the trustees and Herbert H. White, as an adverse claimant of a lien on the real estate of the bankrupt.

The Supreme Court in the recent decision of Taylor v. Voss, 271 U. S. 176, 180, 181, 46 S. Ct. 461 (70 L. Ed. 889), has undertaken to define what are controversies arising in bankruptcy proceedings and what are proceedings in bankruptcy. It is there said:

"It is now settled by the decisions of this court, that the 'controversies arising in bankruptcy proceedings' referred to in section 24a, include those matters arising in the course of a bankruptcy proceeding, which are not mere steps in the ordinary administration of the bankrupt estate, but present, by intervention or otherwise, distinct and separable issues between the trustee and adverse claimants concerning the right and title to bankrupt's estate. Hewit v. Berlin Machine Works, 194 U. S. 296, 300 [24 S. Ct. 690, 48 L. Ed. 986]; Coder v. Arts, 213 U. S. 223, 234 [29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008]; Tefft & Co. v. Munsuri, 222 U. S. 114, 118 [32 S. Ct. 67, 56 L. Ed. 118]; Swift & Co. v. Hoover, 242 U. S. 107, 109 [37 S. Ct. 56, 61 L. Ed. 175]. In such 'controversies' the decrees of the court of bankruptcy may be reviewed by appeals which bring up the whole matter and open both the facts and the law for consideration. * * *

"On the other hand, the 'proceedings' in bankruptcy referred to in section 24b are those matters of an administrative character, including questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate. Matter of Loving, 224 U. S. 183, 188 [32 S. Ct. 446, 56 L. Ed. 725]. In such administrative matters—as to which the courts of bankruptcy proceed in a summary way in the final settlement and distribution of the estate, U. S. Fidelity Co. v. Bray, 225 U. S. 205, 218 [32 S. Ct. 620, 56 L. Ed. 1055]—their orders and decrees may be reviewed by petitions for revision which bring up questions of law only."

See, also, Quinn v. Gardner (C. C. A.) 28 F.(2d) 270; In re First National Bank (C. C. A.) 135 F. 62; Dodge v. Norlin (C. C. A.) 133 F. 363; In re Sola e Hijo, S. en C. (C. C. A.) 261 F. 822, 826.

In view of the foregoing, we have no hesitation in holding that this court has jurisdiction of this appeal.

This litigation had its origin in a petition filed by the trustees with the referee asking that the bankrupt and Herbert H. White be ordered to convey to the trustees all their rights, titles and interests in a certain tract of land, with the buildings thereon, situated in Central Village in the state of Connecticut. It was alleged that at the time of the filing of the bankruptcy petition, and for a long time prior thereto, the bankrupt was the owner of the property; that he had failed, though requested, to turn the same over to the trustees; and that "just prior to the commencement of said bankruptcy proceedings, the bankrupt conveyed the said real estate * * * to the defendant, Herbert H. White, without consideration and for the sole purpose of concealing the same from the trustees"; that said Herbert H. White holds the title of said real estate, as agent of the bankrupt, and refuses to convey the same to the trustees.

At the hearing before the referee on this petition, Herbert H. White appeared and objected to the referee's jurisdiction and without waiving his objection thereto participated in a hearing on the merits.

At that time he orally and by his evidence asserted his right to a lien upon the property in question to secure the balance due him on loans advanced by him to Norman from June, 1926, down to the date of and delivery of the deed, the deed being dated February 12, 1927, recorded February 16, 1927, and delivered shortly thereafter and prior to March 15, 1927, the date of the filing of the petition in bankruptcy. His evidence showed, and the referee found, that on April 26, 1926, that Norman was out of debt to Herbert; that shortly thereafter, however, he applied for further loans; that Herbert did not want to let him have any more money, or to get involved in his affairs, but insisted that, if he were to make further loans, he should have some security; that it was thereupon agreed that Herbert would make further advances and that Norman would convey to him the real estate in question as security therefor; that after this understanding was had Herbert advanced in the month of June sums aggregating about $25,000; that shortly thereafter Herbert went to Labrador, thence to California, and did not return to Boston, or see Norman, until late in February, 1927 (February 24th or 25th); that before going away Herbert made several demands for a conveyance of the property, but Norman did not give it to him; that between June and December 31, 1926, Herbert, or his Boston representative, advanced to Norman sums aggregating $100,000, a large portion of which he repaid, leaving on December 31st an indebtedness of about $30,-

000; that, as late as February 10, 1927, Norman persuaded Herbert's representative to advance him about $4,000 more; that on February 12, 1927, Norman executed a deed of the property to Herbert, had it recorded on February 16th, and later, after its return from the registry, delivered it to Herbert as above stated. Having found the agreement made between the parties—on Herbert's part a promise to advance money, and on Norman's part a promise to give a deed of the real estate as security therefor, the advancement of about $25,000 in June, the later advancement of further large sums of money, and the subsequent delivery of the deed as security—the referee concluded that the agreement made in the spring of 1926 was never carried out; that Herbert, after demanding that Norman give the deed, which was not then complied with, continued to make large advances of over $100,000 during the balance of the year, and his conduct "seemed to indicate a waiver of the agreement" to give the deed, and having found this he concluded that there was no consideration for the deed; that when Norman executed and delivered the deed he knew he was on the rocks and gave the deed with no thought of his agreement, but with the sole purpose of defrauding his creditors; and that Herbert, by asserting his claim, thereby became a party to the fraud.

He also found that Norman still continues in the possession and occupation of the property the same as though he were the owner, and that Herbert has never taken possession of it.

It is contended on the part of the appellant, Herbert, that the referee was without jurisdiction, in a summary proceeding, to pass upon the validity of his claim; that, while the referee had authority to make such inquiry as was necessary to determine the question of his jurisdiction, he had no authority to determine the merits of the claim as the evidence showed that his claim was substantial and not merely colorable. But, as above pointed out, the referee found that, before and at the time the petition was filed, Norman was in possession of the property and is still in possession of it. This being so, it was immaterial to the jurisdiction of the bankruptcy court whether the adverse claim of Herbert was substantial or otherwise, for, the property being in the possession of Norman, either as absolute or equitable owner, and not having been turned over to the trustees, its constructive possession was in the bankruptcy court, and, constructive possession being in that court, it had exclusive jurisdiction to determine all adverse rights of third parties in and to the property. Taubell-Scott-Kitzmiller Co. v. Fox, 264 U. S. 426, 433, 44 S. Ct. 396 (68 L. Ed. 770).

In that case it is said:

"By the act of 1898 as originally enacted [30 Stat. 544], the power of the bankruptcy court to adjudicate, without consent, controversies concerning the title, * * * was confined to property of which it had possession. The possession, which was thus essential to jurisdiction, need not be actual. Constructive possession is sufficient. It [constructive possession] exists where the property was in the physical possession of the debtor at the time of the filing of the petition in bankruptcy, but was not delivered by him to the trustee; where the property was delivered to the trustee, but was thereafter wrongfully withdrawn from his custody; where the property is in the hands of the bankrupt's agent or bailee; where the property is held by some other person who makes no claim to it; and where the property is held by one who makes a claim, but the claim is colorable only. As every court must have power to determine, in the first instance, whether it has jurisdiction to proceed, the bankruptcy court has, in every case, jurisdiction to determine whether it has possession actual or constructive. It may conclude, where it lacks actual possession, that the physical possession held by some other persons is of such a nature that the property is constructively within the possession of the court.

"Wherever the bankruptcy court had possession, it could, under the act of 1898, as originally enacted, and can now, determine in a summary proceeding controversies involving substantial adverse claims of title. * * * But in no case where it lacked possession, could the bankruptcy court, under the law as originally enacted, nor can it now (without consent) adjudicate in a summary proceeding the validity of a substantial adverse claim."

It is well settled that if the District Court, as a bankruptcy court, has actual or constructive possession of property, it has summary jurisdiction to try and determine the merits of adverse claims asserting a title to or an interest in such property. Boyle v. Gray (C. C. A.) 28 F.(2d) 7, 15.

The referee therefore had jurisdiction to determine the merits of the appellant's claim.

Now, as to the merits of the case, it is clear from the above recital of the facts found by the referee that the primary facts

are not in dispute; that it is the deductions made or the conclusions drawn from those facts that are questioned. It is the contention of the appellant that the deductions are wholly without warrant and largely a matter of guess. With this view we are in substantial accord. The referee has found that in the spring of 1926 Herbert promised to make advances of money to Norman and in consideration therefor the latter promised to deed the Connecticut property as security for the advances made, and that in reliance on this agreement Herbert in June advanced about $25,000; that later, and before December 31, 1926, his representative advanced about $100,000 more; and that in February, 1927, Norman executed, recorded, and delivered to Herbert a deed of the Connecticut property, as he had previously agreed to do. The natural and reasonable inference from these facts is that Norman gave the deed in pursuance of his agreement and as security for the advances that had previously been made; but the referee found that, because Herbert had requested a deed of the property before going to Labrador and had not got it, and continued thereafter through his representative to advance money to Norman, he had given up the idea and waived the agreement which Norman had made to give a deed of the property as security for the advances made. We think this conclusion was unwarranted and unsupported by the evidence. Waiver is but another term for estoppel, and there is clearly no basis here for a finding that Herbert had estopped himself to assert his rights under the contract. Norman did not alter his position to his damage by reason of the fact that Herbert, after his departure for Labrador, continued to make loans through his representative to Norman. It is further apparent that the referee, having found that Herbert had waived his rights under the contract, then concluded that there was no consideration for the deed, and, there being no consideration for the deed, Norman's delivery of it, at a time when he knew he was insolvent, was a fraud on his creditors. But, as the finding of estoppel or waiver by Herbert of his rights under the contract was unwarranted, the deductions of the referee that the deed was without consideration and its delivery to Herbert was a fraud on creditors cannot be sustained. The deed was undoubtedly delivered to Herbert in compliance with Norman's promise and in fulfillment thereof. It remains to be considered whether the agreement to give a deed of the Connecticut property as security created an equitable lien in that property which may be enforced. It

does not appear that at the time this agreement was made any money was advanced. The record apparently shows that the first money advanced was in the month of June, some time after the agreement was made. Neither does it appear that it was agreed that the real estate should be held as security from the time the agreement or an advancement was made and before the deed was given. On the contrary, it appears to have been a mere agreement to give at some future time a deed of the land, and that when the deed was given the land should be held as security for advancements made prior thereto. If the agreement had been that, from the time the loans were made, the land should be held as security therefor, undoubtedly an equitable interest or lien would have arisen in Herbert's behalf when and as an advancement was made. But the facts in this case show that the agreement was not for a present right in the land, but was an agreement or promise to deed the land at some future time. This being so, no present right was created in the land at the time the agreement was made, and no such right arose until the deed was delivered in February, 1927, which was within four months of the filing of the petition in bankruptcy.

The decisions in Crosby v. Packer (C. C. A.) 22 F.(2d) 611, and Mass. Trust Co. v. MacPherson (C. C. A.) 1 F.(2d) 769, proceed upon the theory that the agreements there under consideration created equitable interests or liens in the property, as of the time they were made; that they were not mere promises to give security in the future, as in this case, but were agreements for a present right. For these reasons we think the decree of the court below must be affirmed.

The decree of the District Court is affirmed, with costs to the appellees.

ANDERSON, Circuit Judge (dissenting). This record does not contain the evidence before the referee. We know nothing of the facts except as they are set forth in the referee's certificate. Allusions to evidence in the majority opinion are without foundation. The referee's certificate is in effect a master's report. Sternburg v. M. Cohen & Co. (C. C. A.) 254 F. 1, 4, and cases cited; 8 Remington, Bankruptcy (3d Ed.) § 3669; In re Noyes Brothers (C. C. A.) 127 F. 286, 287. The primary facts must be taken as true; the inferences from those facts are open to the District Court, and equally to this court.

The controlling facts in that report are as follows:

"For years Herbert has been accustomed to lending money to Norman for short periods. On April 26, 1926, the brothers were square. Thereafter Norman asked for further loans. Herbert did not want to let Norman have any money, and did not want to get involved in Norman's affairs. He insisted that, if he were to make further loans, he must have some security. Norman promised to convey to Herbert a property at Central Village, Connecticut, as security for such advances as might be made. Herbert, who knew that Norman had nothing else to give, agreed to this. Thereafter, in June, Herbert advanced sums aggregating about $25,000. He made several demands for a conveyance of the Central Village property, but Norman never gave it to him. Shortly thereafter Herbert went to Labrador, and from there to California. He did not return to Boston, or see Norman, until late in February, 1927, as will appear later. In the meantime there seems to have been something of a running account between the two brothers; Herbert or his Boston representatives advancing sums to Norman, between June and December 31, 1926, aggregating over $100,000. A portion of these advances were repaid by Norman, so that on December 31st Norman appears to have been the debtor of Herbert to the extent of about $30,000. On February 10, 1927, Herbert's secretary advanced to Norman about $4,000 more, without authority from Herbert, but at the urgent request of Norman, who promised to return it in a day or two.

"It does not appear that Herbert ever made further demand on Norman for a deed of the Central Village property after he left for Labrador some time in the summer of 1926. The loan of $4,000 made on February 10, 1927, by Herbert's secretary, was made without any knowledge of Norman's promise to give Herbert a deed of the Central Village property, without any request for such a deed, and without any expectation that such a deed would be given. It appears to have been made as a result of Norman's persuasion and his promise of immediate repayment.

"On February 12th Norman, without the knowledge of Herbert, and without any request from Herbert or any of Herbert's representatives, executed a deed of the Central Village property to Herbert and had it recorded on February 16th. Within a few days of this time Norman telegraphed Herbert, who was in California, to come home at once. Herbert returned from California about the 22d of February. On the 24th or 25th he met Norman in the office of Norman's lawyer. The interview was a brief one. Norman told Herbert that he and his companies were in bad financial straits. Herbert said he could do nothing, and that Norman must follow the advice of his attorney. There was no discussion at this meeting of Norman's indebtedness to Herbert, or of the conveyance of the Central Village property. Herbert did not know that there had been such a conveyance, and did not learn until some time afterward, when Norman presented him the deed after its return from the registry. * * *

"At the time of this hearing Herbert had never taken possession of the Central Village property, and frankly stated he had no use for it, except as a haven for Norman, who still continues to live there and manage it as though he were the owner.

"The agreement between the brothers made in the spring of 1926 was never carried out. After demanding that Norman fulfill his promise, Herbert appears to have given up. His subsequent conduct would seem to indicate a waiver of the agreement, for in spite of his flat refusal to lend without security, and in spite of Norman's refusal to give the security, Herbert continued to make large advances aggregating over $100,000 during the balance of the year.

"There was no present consideration for the deed of February 12. The loan of $4,000 made just prior to that was advanced without thought of obtaining the deed and in sole reliance upon Norman's promise to repay at once. When Norman did make the deed on February 12, he knew he was on the rocks. I believe he gave that deed with no thought of the recent advance, with no thought of his agreement with Herbert, but with the sole purpose to put this property out of the reach of his creditors and into friendly hands until the storm blew over."

These findings make a plain case of loans made—by running account of advances and partial payments—*on security promised.* The aggregate of "over $100,000" does not mean that the indebtedness at any one time substantially exceeded the unpaid balance of about $30,000 on December 31, 1926. Herbert's refusal, until Norman promised security, to make any further advances, is the controlling finding.

The referee's deductions, from this primary finding, that Herbert waived the agreement for security, and that the conveyance was in fraud of creditors, are held unwarranted by my brethren. They say: "The deed was undoubtedly delivered to Herbert in

compliance with Norman's promise and in fulfillment thereof." In those conclusions I fully concur. They eliminate fraud and waiver.

But my brethren reach the conclusion that the transaction is voidable as an unlawful preference by deducing from the primary facts the conclusion that the agreement was not in legal effect an agreement *for security,* not an equitable lien on the land, but was "a mere agreement to give at some future time. a deed on the land," and that, as the deed was given within four months, it is voidable under section 60 (11 USCA § 96).

From this conclusion I emphatically dissent. It seems to me irreconcilable with the finding (binding on us), *supra,* that, on Herbert's refusal to make *unsecured* advances, an agreement *to give security* was made, and also irreconcilable with the sound inference of this court that the deed was given *"in fulfillment"* of that agreement. The essence of the agreement was *for security.* The security might have taken the form of a mortgage or of a deed, executed at any time. But in equity and in good faith a right in the property promised to be conveyed arose in the lender the moment the loans were made on the faith of the promise. The dealings are to be so construed as to effect, not thwart, the honest, underlying purpose of the parties. Equitable liens frequently arise, not merely from express agreements, but "from circumstances of such nature as to require the presumption upon general considerations of justice as between those conducting commercial transactions according to a reasonable standard of integrity that an equitable lien was meant." Rugg, C. J., in Westall v. Wood, 212 Mass. 540, at page 544, 99 N. E. 325.

The facts in this case, construed in harmony with the "general considerations of justice" and "according to a reasonable standard of integrity," require the conclusion that "an equitable lien was meant." It is only by scholastic artificiality that the agreement can be cut down to little more than idle and empty talk about a deed. If ever an oral agreement to give a deed of, or mortgage on, realty, as security for advances to be made, could create an equitable lien, one was here created.

To summarize: From the primary facts, I can deduce no fraud, the referee's inference; nor "attempted concealment of the bankrupt's assets," the inference of the court below; nor failure of the agreement to create a right in the lender arising at the moment when the loans were made, the conclusion of the majority of this court. Viewed in proper perspective, the transaction was nothing but the natural and honest attempt of an embarrassed, but still hopeful, debtor to turn his last resource into liquid form in an attempt to escape from the threatened wreck of his business. It took nothing away from his creditors, present or prospective. The transaction was good between the parties, and is, fairly construed, binding on the borrower's trustees in bankruptcy.

On the merits, the case should be reversed.