UNITED STATES FIDELITY AND GUARANTY COMPANY *v.* BRAY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 111. Argued December 15, 1911.—Decided May 27, 1912.

Section 7 of the Court of Appeals Act of 1891, as amended April 14, 1906, 34 Stat. 116, c. 2627 provides for an appeal to the Circuit Court of Appeals from certain interlocutory decrees of the Circuit Court, and in this respect establishes an exception to the general rule in Federal courts that an appeal lies only from a final decree.

Where the jurisdiction of the Circuit Court is invoked not solely on the ground of diverse citizenship but also because the case is one arising under an act of Congress, an appeal lies from the Circuit Court of Appeals to this court, and by § 6 of the Act of 1891 the time within which to take the appeal is one year; the limitation of thirty days under § 7 applies only to appeals to the Circuit Court of Appeals from the Circuit Court.

A distinct purpose of the Bankruptcy Act is to subject the administration of estates of bankrupts to the control of tribunals having authority and charged with the duty of proceeding to final settlement and distribution in a summary way, as are bankruptcy courts.

Under the Bankruptcy Act, the jurisdiction of the bankruptcy court in all proceedings in bankruptcy is intended to be exclusive of all other courts; such proceedings include matters of administration, such as allowance and rejection of claims, reduction of the estate

to money and its distribution, preferences and priorities to be accorded to claims and supervision and control of the trustee.

The Circuit Court cannot entertain a bill in equity which invokes a reconsideration of the referee's order allowing claims as preferred and of determinations of the bankruptcy court as to rights of holders of claims and as to charges that the trustee was speculating in claims; those matters are for the bankruptcy court and fall within its exclusive jurisdiction; nor can it surrender its control thereover or confide them to another tribunal.

A bill in equity attempting to seek an adjudication on matters within the exclusive jurisdiction of the bankruptcy court cannot be sustained as to matters dependent upon the principal matters alleged and which could not have been made the subject of a separate bill within the jurisdiction of that Circuit Court.

170 Fed. Rep. 689, affirmed.

THE facts, which involve the distribution of funds in the hands of a trustee in bankruptcy of a government contractor, are stated in the opinion.

*Mr. B. M. Ambler*, with whom *Mr. W. W. Van Winkle* and *Mr. M. G. Ambler* were on the brief, for appellant.

*Mr. V. B. Archer* and *Mr. William M. Hall*, with whom *Mr. J. A. Dupuy* and *Mr. L. T. Michener* were on the brief, for appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This appeal brings up for review a decree of the Circuit Court of Appeals for the Fourth Circuit reversing a decree of the Circuit Court for the Northern District of West Virginia in a suit in equity which was intended, *inter alia,* to affect a fund of $26,000 in the hands of the trustee of a bankrupt's estate then in the course of administration in the District Court of that district. The decree reversed was an interlocutory one granting an injunction, but the decree of reversal was final, for it directed not only dissolution of the injunction but also the dismissal of the bill.

The complainant, the United States Fidelity and

Guaranty Company, is a Maryland corporation; three of the defendants, the Second National Bank of Parkersburg, the Farmers and Mechanics National Bank of the same place, and the Nicolette Lumber Company, are citizens of West Virginia, resident in the district in which the suit was brought; seven of them, Jacob Eichel and Laura Eichel, his wife, the City National Bank of Evansville, the First National Bank of Evansville, the Citizens National Bank of Evansville, the First National Bank of Rockport, and the Farmers Bank of Rockport, are citizens and residents of Indiana; another, the Riter-Conley Company, is a Pennsylvania corporation; and M. J. Bray, the trustee of the bankrupt's estate, who was sued in that capacity and also as an individual, is a citizen and resident of Indiana. The bankrupt, the Evansville Contract Company, was an Indiana corporation. Of course, the national banks are Federal corporations, but their citizenship and places of residence are, for jurisdictional purposes, as just stated. Act August 13, 1888, 25 Stat. 433, c. 866, § 4.

The jurisdiction of the Circuit Court was invoked on the ground of diversity of citizenship, and on the further ground that the case was one arising under the act of August 13, 1894, 28 Stat. 278, c. 280, amended February 24, 1905, 33 Stat. 811, c. 778; and the right to bring the suit in that district against the defendants who were not resident therein was rested upon § 8 of the act of March 3, 1875, 18 Stat. 470, 472, c. 137, on the theory that the suit was one to enforce a lien and claim upon personal property within the district, that is, upon the fund in the hands of the trustee, which he then had on deposit in the two Parkersburg banks. Section 23a of the bankruptcy act was also relied upon as sustaining the jurisdiction.

The case made by the bill and its exhibits was this: About 1902 the Evansville Contract Company, which will be spoken of as the contractor and as the bankrupt, entered into four several contracts with the United States

for the construction of certain river improvements, one in South Carolina, two in the Western District of Pennsylvania, and another in the Northern District of West Virginia. Each contract contained, among others, provisions that a designated percentage of the moneys earned thereunder should be retained by the Government until the completion of the contract, and that in case of default by the contractor the Government should have the right to take possession of the work and plant and prosecute the work to completion. The complainant, the United States Fidelity and Guaranty Company, which will be spoken of as the surety company, became the surety on the bonds given by the contractor for its performance of the contracts. Each bond, conformably to the act of August 13, 1894, *supra*, was conditioned that the contractor should fully perform the contract according to its terms and should promptly make full payment to all persons supplying it with labor or materials for the prosecution of the work named in the contract. As an inducement to the execution of each bond the contractor agreed with the surety company as follows:

"   .   .   .   and it does hereby bind itself, its successors and assigns, to indemnify the said The United States Fidelity and Guaranty Company against all loss, costs, damages, charges and expenses whatever, resulting from any of its acts, default or neglect that said The United States Fidelity and Guaranty Company may sustain or incur by reason of its having executed said bond or any continuation thereof. And it does further agree, in the event of its being unable to complete or carry on the aforementioned contract, to assign, and does hereby assign, such plant as it may own, or have upon said work to the said The United States Fidelity and Guaranty Company, under the aforesaid obligation, together with vouchers or other evidence of payment, of all costs and expense whatever incurred by said The United States

Fidelity and Guaranty Company in adjusting such loss or in completing said contract, as conclusive evidence against it, its successors and assigns, of the fact and extent of its liability under said obligation to the said The United States Fidelity and Guaranty Company. And it does further agree in the event of any breach or default on its part in any of the provisions of the contract hereinbefore mentioned, that The United States Fidelity and Guaranty Company as surety upon the aforesaid bond shall be subrogated to all its rights and properties as principal in said contract, and that deferred payments and any and all moneys and properties that may be due and payable to it at the time of such breach or default or that may thereafter become due and payable to it on account of said contract, shall be credited upon any claim that may be made upon The United States Fidelity and Guaranty Company under the bond above mentioned."

The contractor partially performed each contract, but became embarrassed, and in February, 1904, on the petition of creditors, was adjudged a bankrupt by the District Court for the Northern District of West Virginia, which appointed three trustees of its estate, M. J. Bray being one. The trustees took charge of its property, and, by an order of the referee having the approval of the creditors, were authorized to complete the contracts, to borrow $75,000 on trustee's certificates, which were to be a first lien on the property and moneys of the estate, to pay the annual premiums accruing to the surety company and to save it harmless from any liability on the bonds, to collect from the Government the contract price and all retained percentages, and to employ Jacob Eichel, who had been the president of the contractor, to assist in completing the contracts and looking after the interests of the creditors. At first the surety company was disposed to object to such an order, but the seven banks before mentioned.

which were unsecured creditors having claims aggregating $115,000, overcame its objection and secured its express consent to the order by executing to it a bond in the sum of $75,000, whereby they undertook to indemnify and hold it harmless from all liability accrued or to accrue by reason of its suretyship. The terms of this bond were such that the liability of the banks thereunder was to be several, not joint, and was to be confined to specified proportions of its penalty.

Thereafter the trustees carried all the contracts to completion, received from the Government the entire contract price and the retained percentages, sold the bankrupt's property, paid all the certificates issued under the order before mentioned, and on December 19, 1905, had on hand a balance of $36,602.96, subject to allowances and costs of administration yet undetermined. The completion of the contracts was undertaken in the expectation of all concerned that a profit to the estate would result therefrom, but the expectation was not realized. In March, 1906, M. J. Bray became the sole trustee; and on September 21, 1907, when the bill was filed, the net amount remaining in the trustee's hands, after deducting the allowances and costs of administration, was about $27,600, of which $26,000 was held on deposit in equal amounts in the two Parkersburg banks.

The total liabilities of the contractor at the time it was adjudged a bankrupt were about $200,000, and of these $42,164.89 were allowed by the referee, November 19, 1904, as preferred claims for labor and materials furnished the bankrupt in the prosecution of the work under the contracts. Most of the claims allowed as preferred were purchased, at much less than their face value, from the original claimants by Philip W. Frey, who was counsel for the trustees. His purchases were principally in advance of the allowance, but in some instances were made thereafter. The allowance, however. was in the names of the

original .claimants. Later Frey assigned these claims to Laura Eichel, wife of Jacob Eichel, the cost to her being $27,037.39, although the face value was $35,663.82. She acquired them with money obtained from Bray under an arrangement whereby both were to share in the profits realized upon their ultimate payment. These transactions, it is alleged, were in pursuance of a wrongful conspiracy between Bray, Frey and Jacob Eichel, were in violation of their fiduciary relations to the estate, and were had with the purpose of making Bray the real but secret owner, the name of Laura Eichel being used as a mere cover; and it is also alleged that some of these claims are excessive and unjust, that others are not for labor or materials, and that Bray, Frey and Jacob Eichel wrongfully procured or acquiesced in their allowance as preferred claims so that Bray and his associates might profit thereby.

In February, 1906, after it became evident that the net proceeds of the estate would not be sufficient to pay the preferred claims for labor and materials, the surety company filed in the cause in bankruptcy a petition asserting, *inter alia,* a lien upon the funds in the hands of the trustees and a right to have the same applied to the payment of the claims for labor and materials upon which recourse could be had against it as the contractor's surety, and praying that such lien and right be respected and enforced, that the court would ascertain what claims were for labor and materials and would direct that the funds remaining be applied to them. The trustees demurred to this petition and the demurrer was overruled. Bray, on becoming the sole trustee, answered, evidence was taken, and the matter is still pending before the referee.

In March, 1907, separate actions were commenced against the surety company in the Common Pleas Court of Allegheny County, Pennsylvania, in the name of the United States for the use of Laura Eichel, on the claims

assigned to her as before stated; and in August, 1907, like actions were commenced on these claims in the Circuit Court of the United States for the Western District of Pennsylvania. Both sets of actions are still pending, and it is alleged that they were brought at the instance of Bray and were really for his use and benefit. These actions were not confined to claims arising under the contracts which were to be performed in that district, but included claims arising under the other contracts which were to be performed elsewhere.

Substantially all the claims against the bankrupt's estate, save those of the defendants the Riter-Conley Company and the Nicolette Lumber Company, each of which has a preferred claim for labor or materials, have been acquired and are now held by Bray and the two Eichels, or one or more of them, and these parties are endeavoring, as is alleged, to compel the surety company to pay claims that are unjust, and to divert the funds in the hands of the trustee from the payment of just claims for labor and materials to the payment of general claims as to which recourse cannot be had to the bond of the contractor. The seven banks which gave the indemnity bond to the surety company are no longer creditors of the bankrupt's estate, their claims being now held by Bray or one or both of the Eichels.

By the bill the surety company asserts (1) that under the indemnity agreements made with it by the contractor, under the contracts with the Government and the bonds given pursuant to the act of August 13, 1894, *supra*, for their performance, and under the equitable doctrine of subrogation it has a lien on the fund remaining in the hands of the trustee, is entitled to have that fund applied to the payment of just claims for labor and materials as to which recourse can be had against it as surety, and is entitled to every right and remedy which the Government or those who furnished the labor and materials

would have against such fund; (2) that Bray and the Eichels are not entitled to be paid on any claim held by them, or any of them, more than the sum actually paid therefor; and (3) that the surety company is entitled to have these matters, as also its liability as a surety and the liability of the several indemnitor banks on their bond to it, litigated and determined in one comprehensive suit.

The prayer of the bill is that an accounting be had to ascertain the several amounts justly due for labor and materials furnished the contractor in respect of each of the contracts with the Government; that the surety company's liability on each of the bonds be fixed and apportioned as to each party in interest; that the fund in the hands of the trustee be declared subject to a lien for the payment of all just claims for such labor and materials, and the net amount of the fund be applied on such claims; that no claim held by Bray or either of the Eichels be paid in an amount in excess of the sum actually expended for it; that each of the indemnitor banks be held liable to the surety company according to the terms of their bond to it, and the amount of the liability of each bank be fixed and payment thereof directed; that Bray and the Eichels be enjoined from maintaining any of the actions theretofore begun against the surety company and from instituting any other like action against it; and that it be granted such other relief as may be appropriate to the occasion.

Before the bill was filed, the District Court having charge of the estate of the bankrupt entered an order granting leave to the surety company to begin the suit in the Circuit Court.

In the Circuit Court all the defendants save the Riter-Conley Company challenged in various ways the jurisdiction of that court, but an interlocutory decree was entered overruling the objections to the jurisdiction and enjoining Bray and the Eichels, until the further order of the court, from prosecuting or maintaining any of the

actions against the surety company then pending in the courts, Federal and state, in Pennsylvania, and from beginning any other like action against it. All the defendants, save the Riter-Conley Company and the Nicolette Lumber Company, appealed to the Circuit Court of Appeals, which reversed the interlocutory decree and directed that the injunction be dissolved and the bill dismissed, without prejudice, upon the ground that the Circuit Court was without jurisdiction to entertain it. 170 Fed. Rep. 689. The case is here on the appeal of the surety company.

In the Federal courts an appeal, as a general rule, lies only from a final decree. But § 7 of the act of March 3, 1891, 26 Stat. 826, c. 517, as amended April 14, 1906, 34 Stat. 116, c. 1627, establishes an exception by providing for an appeal to the Circuit Court of Appeals from an interlocutory decree granting or continuing an injunction or appointing a receiver. It was under this section that the appeal to that court was taken, and on that appeal the court was authorized to review the whole of the interlocutory decree, not merely the part granting the injunction, and also to determine whether there was any insuperable objection, in point of jurisdiction or merits, to the maintenance of the suit, and, if there was, to direct a final decree dismissing the bill. *Smith* v. *Vulcan Iron Works*, 165 U. S. 518; *In re Tampa Suburban Railroad Co.*, 168 U. S. 583; *Mast, Foos & Co.* v. *Stover Manufacturing Co.*, 177 U. S. 485; *Ex parte National Enameling Co.*, 201 U. S. 156. In the exercise of this authority the Circuit Court of Appeals reached the conclusion that the suit could not be maintained in the Circuit Court, and directed both that the injunction be dissolved and that the bill be dismissed. That was a final decree, and as the jurisdiction of the Circuit Court had been invoked not solely upon the ground of diverse citizenship, but also upon the ground that the suit was one arising under the act of Congress

whereunder the bonds upon which the complainant was surety were given, a further appeal to this court was rightly allowed under § 6 of the act of March 3, 1891, *supra,* the amount in controversy being in excess of $1,000, exclusive of costs. *Henningsen* v. *United States Fidelity and Guaranty Co.,* 208 U. S. 404; *Howard* v. *United States,* 184 U. S. 676, 680. The time prescribed in that section for taking such an appeal is one year, and this appeal was taken within that time. The thirty-day limitation in § 7 applies only to appeals thereunder to the Circuit Court of Appeals. These views make it necessary to deny a motion to dismiss by which the appellees challenge the jurisdiction of this court.

An examination of the bill discloses that its primary purpose is to obtain an adjudication of certain claims presented against the estate of the bankrupt, now in the course of administration in the bankruptcy court, and of the priority to be accorded to them in the distribution of a fund belonging to the estate and now in the control of that court. That this fund arose in the due administration of the estate, is lawfully in the custody of the bankruptcy court, and is awaiting distribution among such of the creditors as are entitled to participate therein, is a necessary conclusion from the allegations of the bill, and is conceded. The complainant does not assert a title to it, but at most only an equitable right to have it applied to just claims for labor and materials, for which the complainant is liable as the bankrupt's surety under the act of August 13, 1894, *supra.* The real controversy is over the merits of some of those claims, the right of the present holders to assert them for their full amount, and the priority to be accorded to them in the distribution. By an intervening petition in the bankruptcy proceeding the complainant voluntarily submitted its asserted equitable right to the court of bankruptcy for determination, and the matter is now pending before the referee. But by

the present plenary bill in equity it is sought to take from the bankruptcy court the adjudication of the claims in question and the decision of what priority shall be accorded to them. The Circuit Court of Appeals holds that this cannot be done consistently with the Bankruptcy Act, and the correctness of its holding is the principal question presented by this appeal.

We are not here concerned with a suit by a trustee to recover property in the possession of another who claims it adversely, nor with a suit against a trustee to recover property in his possession claimed by another, and therefore the jurisdictional questions incident to suits of that character need not be considered. But we are concerned with a suit against a trustee, the purpose of which is to control the distribution of a fund in his possession, admittedly belonging to the bankrupt's estate, and to determine to what extent and in what order the several creditors shall participate therein.

Section 2 of the Bankruptcy Act invests the courts of bankruptcy "with such jurisdiction *at law and in equity* as will enable them to exercise original jurisdiction in *bankruptcy proceedings,* . . . to

\*     \*     \*     \*     \*     \*     \*     \*

(2) "Allow claims, disallow claims, reconsider allowed. or disallowed claims, and allow or disallow them against bankrupt estates;

\*     \*     \*     \*     \*     \*     \*     \*

(6) "Bring in and substitute additional persons or parties in *proceedings in bankruptcy* when necessary for the complete determination of a matter in controversy;

(7) "Cause the estates of bankrupts to be collected, reduced to money and distributed, and determine controversies in relation thereto, except as herein otherwise provided;

\*     \*     \*     \*     \*     \*     \*     \*

(13) "Enforce obedience by bankrupts, officers, and

other persons to all lawful orders, by fine or imprisonment
or fine and imprisonment;

\* \* \* \* \* \* \* \*

(15) "Make such orders, issue such process, and enter
such judgments in addition to those specifically provided
for as may be necessary for the enforcement of the provi-
sions of this act."

And the section concludes by saying: "Nothing in this
section contained shall be construed to deprive a court
of bankruptcy of any power it would possess were certain
specific powers not herein enumerated."

Section 23a provides: "The United States circuit courts
shall have jurisdiction of all controversies at law and in
equity, *as distinguished from proceedings in bankruptcy,*
between trustees as such and *adverse claimants* concerning
the property acquired or claimed by the trustees, in the
same manner and to the same extent only as though bank-
ruptcy proceedings had not been instituted and such
controversies had been between the bankrupts and such
adverse claimants."

And § 57k reads: "Claims which have been allowed may
be reconsidered for cause and reallowed or rejected in
whole or in part, according to the equities of the case, be-
fore but not after the estate has been closed."

We think it is a necessary conclusion from these and
other provisions of the act that the jurisdiction of the
bankruptcy courts in all "proceedings in bankruptcy" is
intended to be exclusive of all other courts, and that such
proceedings include, among others, all matters of ad-
ministration, such as the allowance, rejection and recon-
sideration of claims, the reduction of the estates to money
and its distribution, the determination of the preferences
and priorities to be accorded to claims presented for
allowance and payment in regular course, and the super-
vision and control of the trustees and others who are em-
ployed to assist them.

The allegations of the bill, other than those relating to the actions brought against the complainant in Pennsylvania and to its contingent claim against the indemnitor banks, are intended to invoke (1) a reconsideration and modification of the referee's order of November 19, 1904, allowing certain claims as preferred claims for labor and materials, (2) a determination of the right of the present holders of those claims to have them rated and paid at their face value, (3) an inquiry into the charge that the trustee and others who were employed to assist him in the management of the estate have been speculating in claims against it and procuring or acquiescing in their improper allowance and classification, and (4) a direction that the just claims for labor and materials be accorded a preference in the distribution. These matters are rightly subjects for proceedings in bankruptcy and therefore fall within the exclusive jurisdiction of the court of bankruptcy. A distinct purpose of the Bankruptcy Act is to subject the administration of the estates of bankrupts to the control of tribunals clothed with authority and charged with the duty of proceeding to final settlement and distribution in a summary way, as are the courts of bankruptcy. Creditors are entitled to have this authority exercised, and justly may complain when, as here, an important part of the administration is sought to be effected through the slower and less appropriate processes of a plenary suit in equity in another court, involving collateral and extraneous matters with which they have no concern, such as the controversy between the complainant and the indemnitor banks.

Of the fact that the suit was begun in the Circuit Court with the express leave of the court of bankruptcy it suffices to say that the latter was not at liberty to surrender its exclusive control over matters of administration or to confide them to another tribunal.

The portions of the bill seeking an adjudication of the

contingent liability of the indemnitor banks to the complainant, and an injunction against the prosecution of the actions against it in Pennsylvania, and against the institution of other like actions, must fall with the rest of the bill. They were brought into it in a secondary and dependent way, and could not then have been made the subjects of a separate bill in that jurisdiction. Further discussion of them is therefore unnecessary.

The decree of the Circuit Court of Appeals is

*Affirmed.*