## In re DIXIE SPLINT COAL CO.

District Court, W. D. Virginia, at Big Stone Gap.
June 23, 1938.

A. K. Morison, of Bristol, Tenn., and H. E. Widener and George M. Warren, both of Bristol, Va., for Mrs. Jean McNeil Pepper.

Henry Roberts, of Bristol, Va., M. M. Long, of St. Paul, Va., and I. M. Quillen, of Lebanon, Va., for Scott Litton.

Carl W. Hamilton and M. M. Heuser, both of Norton, Va., for trustee in bankruptcy.

PAUL, District Judge.

This matter comes before the Court on the petition of Mrs. Jean McNeil Pepper for review of an order entered by the referee on February 4, 1938, and upon a petition of M. M. Heuser and C. W. Hamilton, attorneys, for a review of the same order. Inasmuch as the petitions for review do not involve the same objections, the petition of Mrs. Pepper only will be dealt with in this memorandum.

This matter has previously been before the Court, resulting in an order entered April 21, 1937, in which an order entered by the referee on February 22, 1937, was reversed and the cause sent back to the referee for further proceedings to be had in conformity with views expressed by the Court in a written opinion filed with its order of April 21, 1937. 31 F.Supp. 283.

In that opinion, it was intended to make clear the view of the Court that neither the trustee in bankruptcy nor any creditor was estopped from attacking in this proceeding the validity of a judgment purported to be confessed by the bankrupt in favor of Scott Litton and that since such judgment had been attacked it was the duty of this Court to pass upon it. The opinion specifically directed that the referee should consider and pass upon the question of whether such judgment was void. It further directed that, in case the judgment was found to be void, the referee should make inquiry into the validity of Litton's claim as a general debt. It is obvious that no direction to inquire into the validity of the judgment would have been given unless the Court believed such inquiry was legally permissible.

However, the referee has apparently misunderstood the effect of the previous opinion and its necessary implications, for, after finding that the confession of judgment was void, he has again made a finding that Mrs. Pepper is estopped to attack this void judgment. That there may be no further question or misunderstanding in this respect, it is here stated that the Court intended in its previous opinion to hold and does now again hold and determine that the validity of the Litton judgment is a proper subject of inquiry in this proceeding, that no estoppel exists against the trustee in bankruptcy or any creditor to attack that judgment here and that the validity of the judgment must be passed on by this Court. The reasons for this were set forth in the previous opinion and little need be added to what was there said except to emphasize that the result of the proceedings in the State Court was merely a holding that the trustee could not be there heard to question the judgment because of some supposed estoppel against Mrs. Pepper arising in that Court. The proceeding was brought in the court where the judgment was rendered as a matter of comity, not of necessity. When that Court refused to entertain the proceeding or to act upon the prayer of the bill, this did not tie the hands of the bankruptcy court in performance of its duty and right to pass upon the validity of claims asserted in bankruptcy proceedings. Possibly it was an error that the bankruptcy court did not in the

first instance pass upon the validity of the judgment without seeking the aid of the State Court. U. S. Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 32 S.Ct. 620, 56 L.Ed. 1055. But when the latter court refused to pass upon the validity of the judgment, this Court was not thereby relieved from doing so.

■ In his order of February 4, 1938, the referee, pursuant to the instructions of the Court's previous opinion, has considered and passed on the validity of the Litton judgment. He concludes that because of a failure to comply with the statutory requirements as to confession of judgments, the judgment is void. No exception to his finding in this respect has been taken by Litton and for this reason, as well as because the finding appears sound, it is approved and affirmed. As hereinbefore stated, the referee's holding that this judgment cannot be questioned in this proceeding is disapproved and reversed.

### The Litton Claim as a General Debt

■ The referee has held that the claim of Scott Litton for $33,468.99 (the amount of the void confessed judgment) represents a debt owing and properly payable to Litton. The nature of this asserted debt and the manner in which the amount claimed is arrived at is attended with considerable obscurity. This is due to the fact that Litton and the bookkeeper, Smith, are the only persons who know anything about the basis of this claim, and Litton, in his testimony, was vague, evasive and contradictory, while Smith did not testify at all.

As far as can be determined from the evidence, the alleged claim of Litton for $33,468.99 is based upon the following facts: The Dixie Splint Coal Company, a corporation, was organized in December, 1923, as the successor to and to take over the assets of the Dixie Splint Coal Company, a partnership. Litton had been the dominant figure in the partnership and P. H. Smith its bookkeeper. The organization meeting of the corporation, which was a family affair, was held on December 14, 1923, at which Scott Litton was named president of the corporation, his wife Pauline Jones Litton was named vice-president and Smith was made secretary and treasurer. These same three persons comprised the entire board of directors and continued as such through the life of the corporation. Litton plainly directed the affairs of the corporation, Mrs. Litton did nothing, as far as can be seen, while Smith was clerk and bookkeeper for the business.

What salaries Litton and Smith were drawing under the partnership is not disclosed. When the corporation was organized, the minutes do not show that any salaries were fixed for any of the officers, but at a meeting of the directors held a few weeks later, February 14, 1924, the minutes show that the salary of Litton was "increased" by the amount of $6,000. The typewritten minutes show the salary to be fixed at $6,000, but a handwriting insertion states that the *increase* was in the amount of $6,000. At the same time Smith's salary was increased from $2,700 a year to $8,000. Litton asserts that his salary, after the increase, was $12,000 a year.

However, in setting up the books of the corporation showing the payment of compensation to these parties a peculiar plan was adopted. The company carried one account under the title of "Payroll" under which were entered payments made to employees. Entries of payments to Smith of $250 a month were made under this account and were apparently paid him. The balance of his alleged salary, this balance being $5,000 a year, was placed under a separate account headed "P. H. Smith—Personal", and on this account he was credited with $416.66 each month. The books of the company prior to January 1, 1928, were not available or are not shown in evidence; but beginning with that date it is shown that while regular entries, amounting to $5,000 a year, were credited to Smith under this personal account, no such sums were in fact paid to him. Similarly the compensation of Litton was reflected under two accounts. He was paid on the "payroll" account each month sums in varying amount but which aggregated from $3,000 to $5,700 a year, while there was also a separate account entitled "Scott Litton—Personal" on which he was credited with $500 a month as salary from 1928 to 1931 and with $750 a month for 1932 and 1933. In addition to the payments actually made to Litton on the payroll account, he appears to have been paid the larger portion, though not all, of the amounts credited to him on his "personal" account. These payments were of irregular amounts and at irregular times.

On May 10, 1933, the books show the sum of $26,041.64 credited to Smith under his "personal" account and on that date Smith assigned to Litton a claim in that amount against the corporation in consideration "of

"$1.00, cash in hand, and other valuable considerations". At the same time, it is claimed, the corporation owed Litton $7,427.25 on his back salary. It is the sum of Litton's alleged debt and that assigned him by Smith which make up the amount of the void judgment which was attempted to be confessed; they are also the basis of Litton's claim as a general debt.

There are many circumstances which invoke question of the validity and good faith of this alleged debt. Litton's testimony about it was evasive and contradictory, and he plainly tried to conceal the truth as to the nature of the claim. In the beginning he testified quite positively that the entire amount was for unpaid salary due to him, Litton. I quote from the testimony. After stating that the amount of his judgment was for $33,468.89, he was asked:

"Q. Did the Dixie Splint Coal Company actually owe you any such sum of money as that? A. They did.

"Q. What was it for? A. Services.

"Q. Was it for your regular salary, commissions, loans or what? A. Salary, regular salary they hadn't paid me, that the corporation hadn't paid me since it was organized."

He repeated this statement several times and stated that he could show by the books of the corporation that there was past due salary owing to him in the amount of the judgment. When asked if any other officers of the corporation had not been paid in full, he stated that Smith had not. And when asked if the unpaid portion of Smith's salary was not seven or eight hundred dollars, he replied: "Possibly, I don't recall the exact amount."

It was only when he was asked to show upon the books the foundation for his claim and was confronted with them that he admitted that $26,041.64 of his claim was not for salary due to him but represented the amount supposed to be due to Smith for unpaid salary and assigned by Smith to him. No excuse of confusion or of lapse of memory could justify the lack of truth and candor exhibited by this witness.

It is contended by counsel for Mrs. Pepper that the amounts credited to Litton and to Smith under their respective "personal" or salary accounts do not represent amounts actually due and owing them as salary but that they were set up for income tax purposes in order that they might be reported and deducted as part of the expense of business in arriving at the net income for taxation, and for the further purpose that Litton and Smith might be in position to appear as creditors if the business got into financial difficulties. The income tax returns of the corporation from 1926 to 1933 have been offered in evidence and they show that "salaries of officers" were reported as follows and utilized in the computation of net income for taxation: For each of the years 1926, 1928, 1930, 1931 and 1932, salaries were reported at $17,000; 1927 and 1929 at $11,000; and for 1933 at $15,000. Just why the variance in the amounts for the years 1927 and 1929 does not appear. And it is noted that in the years when salaries were reported at $17,000 the schedules in which the individual salaries are supposed to be listed are not filled out and the aggregate amount only is given. Examination of the income tax returns show other unexplained matters. For example in 1929 the report shows a salary of $6,000 to Litton, a salary of $6,000 to Mrs. Litton as vice-president and a salary of $5,000 to Smith. In an attempt to reconcile the books of the company with its tax returns so many apparent discrepancies appear as to make it impossible to tell how these accounts were handled.

The testimony of Litton is practically an admission that these alleged salaries were entered on the books for income tax purposes and were not bona fide obligations of the corporation. When repeatedly asked if this were not the purpose, he was extremely evasive, refusing either to admit or deny. The most tolerant and least critical view that could be taken of these book charges for salaries is that it was intended, if the corporation showed large profits on its business, these profits should be distributed under the guise of salaries to cut down the income tax; but in the absence of any such profits they were not to be paid and that they were not to be taken as absolute and binding obligations against the corporation. The testimony of Litton practically admits this. As to the supposed salary to Smith, it seems reasonably clear that it was never intended that it should be paid him. While Litton did draw large portions of his supposed salary in irregular amounts and at odd times through the years from 1928 to 1933, payments to Smith were confined, except for trivial amounts, to the $250 a month paid him on the "payroll account". The claim assigned by Smith to Litton on May 10, 1933 was for $26,041.-64. This represented accumulations of

salary for over 5 years at a rate of $5,-000 a year, which was the rate at which salary was credited to Smith on his personal or salary account. Every fact and circumstance disclosed argues strongly against the good faith and genuineness of this alleged salary accumulation of Smith, which now forms the larger part of Litton's claim. In addition to the inferences and implications to be drawn from Litton's testimony, it is impossible to overlook the following significant facts: It is hard to believe that Smith, a bookkeeper and clerk, who had been paid $2,700 a year, should, with no change in the nature of his work, receive a sudden increase in salary to $8,000 a year, except upon an understanding that it was merely for record purposes and not to be paid. It is inconceivable that he should have allowed his salary to accumulate for over five years to the amount of over $26,000 without making any effort to collect any part of it. And it is even harder to believe that if he had a valid debt against the corporation for over $26,000 he would assign all interest in it for $1. It is true that the assignment was for $1 and "other considerations", but when Litton was asked what the "other considerations" were he answered vaguely and finally stated that he was unable to say what they were.

In that portion of the referee's report dealing with the nature of Litton's claim, the referee seems to have assumed that because these disputed salaries were shown on the income tax reports of the Dixie Splint Coal Company and used in the computation of the company's net income, they represented a valid and existing debt. He, therefore, allowed the claim in full. The referee does not discuss, but completely ignores, the very question which has been raised against the claim, namely, that the debt is fictitious and was set up for the very purpose of obtaining an advantage in the payment of income taxes. He overlooks the fact also that, even if the debt were a valid one, a substantial part of it is barred by the statute of limitations. It would have been barred if asserted by Smith and the latter's assignment to Litton did not help that situation.

However, I am of opinion that the entire claim should be disallowed. I am convinced that neither the alleged salary due Litton nor that due Smith represents an honest debt owing by the bankrupt corporation. On the other hand, the evidence is strong that these alleged salaries were voted and set up for the double purpose of using them to lessen income taxes and to enable Litton to appear as a creditor of the corporation in case it became financially involved. In the latter purpose they enabled Litton, in case the corporation became insolvent, to step in with a claim so large as to assure that he would procure the major part of any distribution made, to the disadvantage of honest creditors. And it was so used. While Mrs. Pepper's suit against Dixie Splint Coal Company was pending, and in evident anticipation of its outcome, Litton took the assignment of Smith's alleged claim and caused the confessed judgment to be entered in his favor. To this Court it appears that the matter of these alleged salaries was a part of an entire plan aimed to defeat the collection of the debts of any honest creditors which the Dixie Splint Coal Company might have had and which culminated in the judgment confessed in favor of Litton and the execution sale thereunder—a matter upon the moral phases of which the Court has already commented in its previous memorandum.

■ But even if we assume, and it would be the most tolerant assumption that could be made, that the salaries credited to Litton and Smith were intended to be paid whenever the profits of the company permitted and that this was merely a manner of distributing profits in the guise of salaries rather than as dividends, the claims would still not be allowable. They were not fixed liabilities absolutely owing, but were merely contingent or conditional obligations which are not provable. The testimony of Litton, under cross examination, is practically an admission of the contingent nature of these alleged obligations for salaries.

The Motion to Appraise the Property Sold Under the Void Judgment

■ The Court in its previous memorandum held that the trustee was not estopped to question the validity of the Litton judgment and directed the referee to determine whether the judgment was void. In the last proceedings before the referee and relying on the finding that the judgment was void, counsel for Mrs. Pepper asked that the referee direct an appraisement to be made of the value of the property which had been sold under execution issued on the void judgment. It appears that this property was bought in for $3,250 by Litton, who testifies that he

bought it as agent for another corporation which was then in process of formation. But the records of this new corporation, known as Dixie Beaver Coal Company, show that shortly after acquiring the property at the execution sale, Litton transferred it to the new corporation at a valuation of $20,135.36, to be paid for in stock of the corporation; and a resolution of the directors of the corporation certifies that in their judgment the property "formerly owned by Dixie Splint Coal Company and now owned by Scott Litton is worth $20,135.36 in current money of the United States and we fix the value of same at this sum, which is to be paid for in stock".

The referee, in addition to holding that Mrs. Pepper was estopped to question the validity of the Litton judgment, expressed the view that the motion now considered came so late as to make Mrs. Pepper guilty of laches and justified denial of the motion on this ground also. It is difficult to see wherein the view of the referee is justified. Mrs. Pepper has never acquiesced in the validity of the judgment nor ceased to question it. While her suit for the purpose of having it declared void was pending, the Dixie Splint Coal Company went into bankruptcy. Since then the trustee in bankruptcy, representing the creditors, has been trying to get a declaration as to the validity of the judgment. Not until the referee, in the order now under review, held that the judgment was void, was there any definite determination of that fact. Until there was such a determination no action looking toward an accounting for the value of the property was applicable. It was promptly taken as soon as it was proper to do so.

■ A judgment which is void is a mere nullity and affects the rights of no one. It has merely the semblance of a judgment. 34 C.J. 509. In Freeman on Judgments, 3d Ed. § 117, it is said: "A void judgment is, in legal effect, no judgment. By it no rights are divested. From it no rights can be obtained. Being worthless in itself, all proceedings founded on it are equally worthless. It neither binds nor bars anyone. All acts performed under it and all claims flowing out of it are void. The parties attempting to enforce it may be responsible as trespassers. The purchaser at a sale by virtue of its authority finds himself without title and without redress. * * *"

■ If the Litton judgment was void as the referee has determined and as seems to be generally conceded, then it follows that the purported sale under execution was of no effect, that no title passed thereby and that the property purported to be sold may be pursued as the property of the bankrupt and it or its value recovered for the benefit of the bankrupt estate. The value of the property should be ascertained and it should be disposed of as assets of the estate.

The evidence taken in this case and the disclosures made thereby since its previous consideration by the Court serve only to give additional weight to the belief previously expressed that the Litton claim and every step taken in connection with it were parts of a planned and fraudulent scheme to prevent the collection of their debts by honest creditors. The claim had a fictitious basis in the first place and was never asserted until there seemed a prospect that Mrs. Pepper would obtain a judgment on a debt justly due her. The confessed judgment was void and the sale under it obviously little more than a gesture whereby Litton was enabled to buy in the entire tangible property of the corporation at a nominal sum and transfer it to another of his one-man corporations, thereby enabling him to continue in business after having prevented payment of his honest debts. If courts of equity, with full knowledge of such a state of facts as are here disclosed are powerless to interfere, then they are grossly misnamed and the law becomes the shield of fraud rather than a weapon against it.

While the facts in the case of Buffum v. Peter Barceloux Company, 289 U.S. 227, 53 S.Ct. 539, 77 L.Ed. 1140 are not on all fours with the present case, there is a striking similarity in the calculated and fraudulent plan to avoid payment of a debt and in the manner in which the affairs of family corporations may be handled to that end and much that is said in that case is applicable here.

The Objection to the Allowance of the Claim of Mrs. Jean McNeil Pepper

■ Counsel for Litton offered what is termed a conditional objection to the allowance of the claim of Mrs. Pepper for $9,000. The referee overruled the objection and allowed the claim and no review of the referee's action in this respect has been applied for. For this reason and because the objection was plainly trivial and

without merit, the action of the referee in this respect is approved without discussion.

An order will be entered carrying out the views expressed in this memorandum.