Willard M. BERMAN and Jack M.
Berman, Plaintiffs,

v.

NATIONAL ACCEPTANCE COMPANY
OF AMERICA, a Delaware Corporation,
and Lawrence H. Tayne, Defendants,

v.

Lukin T. GILLILAND, Trustee in Bank-
ruptcy, Cross-claim Defendant.

Civ. A. No. 3300.

United States District Court
W. D. Texas,
San Antonio Division.

March 31, 1965.

William C. Church, Jr., San Antonio, Tex., for plaintiffs.

Elmer Ware Stahl, Stahl & Sohn, San Antonio, Tex., Strasburger, Price, Kelton, Miller & Martin, Dallas, Tex., Schimberg, Greenberger, Krauss & Jacobs, Chicago, Ill., for defendants.

Oliver B. Chamberlin, LeLaurin, Chamberlin, Guenther & Murry, San Antonio, Tex., for cross-claim defendant.

CLARY, District Judge (sitting by special designation).

This action arises out of a series of loan negotiations which culminated in the execution of certain financing and security arrangements between the plaintiffs and corporate defendant. The case is presently before the Court for disposition of the defendants' motion for summary judgment directed at three counts of the plaintiffs' amended complaint. The facts, as disclosed in the pleadings and affidavits made part of this motion, are as follows: The Southwestern Specialty Co. Inc., a Texas corporation, on March 21, 1962, entered into financing agreements with the defendant, National Acceptance Company of America (hereafter NAC), a Delaware corporation, whereby Southwestern was to borrow certain large sums of money in consideration of its assignment to the defendant of its accounts receivable as security. The money was to be advanced by the defendant over a period of two years. Southwestern also entered into a factoring agreement with the defendant whereby the defendant agreed to lend Southwestern $60,000 on its demand note of the same amount, secured by a factor's lien on certain of the borrower's goods, which the defendant deemed acceptable for security purposes.

Simultaneously with the execution of these instruments, the plaintiffs, Jack M. Berman and Willard M. Berman, officers of Southwestern, entered into a guaranty agreement wherein they agreed to be "directly, unconditionally and primarily liable, jointly and severally" with the debtor corporation. It is that guaranty which is the subject of this portion of the litigation. As security for their guaranty, the plaintiffs executed a $150,000 demand promissory note, payable to NAC, and a deed of trust conveying real estate known as 403 Dawson Street, in the city of San Antonio, to H. T. Hebdon as trustee. This deed of trust was intended to secure the plaintiffs' demand note.

After the execution of these documents, the defendants began to advance money to Southwestern Specialty, and Southwestern made periodic repayments to the defendants in partial compliance with the terms of its financing agreement. Thereafter, in September 1962, a suit for receivership of Southwestern was instituted in the state court at Bexar County, Texas. Finally, on December 26, 1962, Southwestern Specialty Co. Inc. was adjudged

a bankrupt in the United States District Court for the Western District of Texas.

In the latter part of May, 1963, this action was instituted in the District Court in Bexar County, which was later removed to the United States District Court for the Western District of Texas. In their petition, the plaintiffs sought to restrain the sale of the Dawson Street property under the deed of trust and an accounting of the amounts due and owing NAC by Southwestern. The injunction was denied by the late Judge Rice on July 31, 1963.

The original pleadings in this case have undergone substantial revisions and amendments since the original complaint was lodged; the resolution of numerous issues preceded this case's present posture, and an additional motion is outstanding on another phase. Thus, only those facts and pleadings which have a bearing on and are material to the motion for summary judgment will be considered at this point and discussed in the recitation of the facts which follows.

Since the institution of the original action in the state courts, the defendant, NAC, has exercised its power of sale under the deed of trust predicated upon Southwestern's failure to make required payments. H. T. Hebdon, the trustee, refused to act, and in accordance with the powers of NAC set forth in the trust instrument, the defendant, Lawrence H. Tayne, was appointed as substituted trustee. A sale was conducted on August 6, 1963 and a deed of conveyance of the plaintiffs' property at 403 Dawson Street was delivered to NAC. The property brought $60,000 at the substituted trustee's sale, which was subject as follows: $2,054.78 in delinquent city and school taxes; $1,011.59 in state and county taxes, and $22,583.06 first lien debt to Connecticut General Life Insurance Company, past due and unpaid since May 1, 1963.

This is the broad background of this litigation into which fits the plaintiffs' more specific claims for relief. On May 1, 1964, the plaintiffs filed their amended complaint and answer to NAC's counterclaim for the amounts due them under the principal loan agreement and other assigned indebtedness not material to the discussion here. The complaint asserts facts which plaintiffs allege give rise to three causes of action, and the defendants' motion for summary judgment is directed at all three counts.

## I.

In the first count, plaintiffs allege that they were and still are owners of the premises at 403 Dawson Street, and that NAC's entry of possession after August 6, 1963 (the date of the substituted trustee's sale) was wrongful. The plaintiffs seek damages for the monthly rental income fixed at $1200 per month since the date of the alleged wrongful possession. As the defendant points out in his brief and the plaintiffs conceded at oral argument, the plaintiffs, in effect, have made out a cause of action in trespass to try title, which is inappropriate in this state since they do not allege that the substituted trustee's deed is void, but only voidable. However, regardless of how the action is titled, a recovery based on an unlawful possession of the premises in question, must of necessity depend upon the validity of the defendant NAC's claim to title. This claim is made through a deed of conveyance executed August 6, 1963, wherein the Dawson Street property was conveyed by the defendant, Lawrence H. Tayne, to the defendant, NAC. The validity of this deed in turn depends upon the regularity of the deed of trust and the sale conducted pursuant thereto. In view of this Court's holding that the sale was in all respects regular (see the discussion of Count II which follows), thereby validating the deed of conveyance, the plaintiffs' claim that NAC has wrongfully possessed the premises must fall. The plaintiffs' oral motion to amend their pleadings, changing the cause of action from trespass to try title to an action to remove a cloud on title, will be denied, and the defendants' motion for summary judgment on this count will be granted.

## II.

After reciting the aforementioned statement of facts and the execution of the various security agreements by the plaintiffs and Southwestern Specialty Company, the plaintiffs state that they have made several unsuccessful attempts to determine exactly what amounts are due and owing the defendant, NAC. In fact, a determination of the exact amounts due was the subject of the plaintiffs' original complaint in this action.

Despite the state court receivership proceedings and later the bankruptcy proceedings commenced in this Court, the plaintiffs insist that the exact amount of NAC's loan to Southwestern (which is outstanding) is still uncertain. NAC appears to have been consistent in its assertion of a claim of $111,998.21, but the plaintiffs criticize this figure on the ground that NAC has refused to disclose just how this amount was calculated. The plaintiffs vigorously and repeatedly assert throughout that the amount is not $111,998.21, and could not be in excess of $88,194.70, although one plaintiff on deposition admitted a principal debt in an amount exceeding $94,000. This Court makes no determination as to the actual amount due NAC, but will take the view of the facts most favorable to the plaintiffs for the purposes of this discussion and assume that the amount is $88,-194.70, while recognizing that this figure is contested by NAC.

The plaintiffs assert that the fair market value of the Dawson Street real estate at the time of the substituted trustee's sale on August 6th was $150,-000 and that there was the balance of an unpaid note due the Connecticut General Life Insurance Company of $22,583.06 constituting a first lien on the property. Then, according to plaintiffs' mathematics, if there were a balance due NAC of $88,194.70 on their guaranty obligation, the plaintiffs still had an outstanding equity interest in the property valued at $25,000.

At the sale on August 6th, the substituted trustee announced to the public that there was due NAC the $111,998.21 amount and no reference was made to the plaintiffs' lower figure, or that the actual amount was in dispute. The property was sold to NAC, the highest bidder, for $60,000, some $90,000 less than its actual value, if the plaintiffs' appraisal is correct. The plaintiffs allege as a result of the defendants', NAC and Lawrence H. Tayne, substituted trustee, "unlawful acts" of announcing an amount due in excess of the correct amount prevented the sale from being a fair one insofar as it discouraged competitive bidding at the sale. The plaintiffs have furnished the affidavit of V. R. Hood who states that he refrained from bidding when he learned of the amount of the debt as announced at the sale.

The plaintiffs then aver that the defendants' activity resulting in restrained bidding caused them to lose $25,000 equity in their property, since in plaintiffs' view had the lower figure been announced, the property could have brought its full fair market value of $150,000. Stated another way, the Court is asked to assume that a $23,000 difference in the announced indebtedness would make a $90,000. difference in the sale price. Thus, once again assuming the correctness of the plaintiffs' figures, the precise issue before the Court on this count is: whether at a sale pursuant to a deed of trust, the announcement of the amount due on the note secured by the deed that is $23,000 in excess of the true amount, vitiates the sale as a fair sale, entitling plaintiffs to damages for their loss of equity in the property. The statement of the issue demands an inquiry into the regularity of the sale.

■ In Texas, sale of property under a deed of trust is tantamount to a strict foreclosure in equity, First Fed. Sav. & Loan Ass'n v. Sharp, 347 S.W.2d 337 (Tex.Ct.Civ.App.1961), provided that all the requisites of sale pursuant to the deed have been complied with fully. Since the exercise of a power under the trust is a harsh remedy, the state courts have insisted on rigid adherence to the various requirements provided by statute and in the trust instrument itself, and in

accordance with this mandate this Court has carefully scrutinized the conduct of this sale.

■■ The power of a trustee under a deed of trust is a narrow one; he has only the special power conferred by the deed and is subject to the limitations and conditions on the exercise thereof. The parties here authorized sale of the property by the trustee upon default in the punctual payment of the indebtedness, or any part thereof; failure to make payments when due or to keep and perform any one or more of the various conditions set forth activated the trustee's power. By their own admissions, the plaintiffs defaulted under their agreement, making the exercise of the power proper. The deed provided for advertising, the time, place and terms of sale of the property for at least twenty-one days successively next before the date of sale by the posting of notices in three public places in the county where the real estate was located, one of which was to be on the courthouse door. The defendants have furnished uncontested affidavits testifying to compliance with the notice requirements. The sale had to occur in accordance with the advertisement in front of the courthouse door on the first Tuesday of any month between 10 A.M. and 4 P.M., to the highest bidder for cash, and this sale occurred the first Tuesday of August, 1963. Other miscellaneous provisions permitted the defendant to be a bidder at the sale, allowed the appointment of a substituted trustee upon the incapacity of the named trustee, and gave the trustee or substituted trustee the power to make a general warranty deed. All of these requisites have been scrupulously observed as is evident from the affidavit of the attorney for the defendant.

The defendants have further protected themselves against attack on this sale by using the following language used in the deed:

"It is expressly agreed that the recitals in the conveyance to the purchaser shall be full evidence of the truth of the matters herein stated, and all prerequisites shall be presumed to have been performed."

The effect of this expression is to place beyond a doubt the regularity of the sale. As has been said in Matthews v. Rains County, 206 S.W.2d 852 (Tex.Ct.Civ.App. 1947), " * * * this court [has] held in the absence of proof to the contrary, the introduction of the trustee's deeds containing recitals therein as to the regularity of the sales makes a prima facie case as a matter of law. * * * There was no question to be determined by a jury."

This point need not be labored further, especially since no fact relating to this aspect of the sale has been seriously contested by the plaintiffs in their affidavits. As to the formal or technical requirements, the Court is well satisfied that the sale in all respects was regular.

■ Despite its formal regularity and the conclusive deed recitals, the plaintiffs nonetheless complain the sale is unfair and quote some general language from Texas Jurisprudence (2d) to the effect that sales made pursuant to a deed of trust can be set aside upon slight proof of unfair conduct, but cite no cases in support of their particular objection. The Court can discover nothing unfair about a secured party who seeks satisfaction from the security after a default in the principal obligation. The amount of the default was not material under the terms of this deed of trust; the critical fact is that there was a default. Nor can the Court see how a contested difference of $23,000 in the announced indebtedness affects the quality of the sale. It can hardly be said that NAC's conduct was unfair, absent a showing that the $111,000 figure was not deviously arrived at, or fraudulently contrived, and when in fact there is only a disagreement about the exact amount due. The $23,000 difference, assuming the plaintiffs' figures are correct, is not so great as to shock the Court at least in this fact sequence. Unfairness can take many shapes and forms; the plaintiffs have chosen to rely on a form which does not have the favor of a previous decision in its support, and

this Court cannot chart new paths consistently with the Erie doctrine.

■ Even treating plaintiffs' complaint as an attack upon the sale for gross inadequacy of consideration (which was not argued), there is very scant support for plaintiffs' position. It has been stated that mere inadequacy of price is not grounds for setting aside a sale. Cline v. Cline, 323 S.W.2d 276, (Tex.Ct. Civ.App.1954). It must be coupled with other evidence of unfairness. The case of Sparkman v. McWhirter, 263 S.W.2d 832 (Tex.Ct.Civ.App.1954) affords an illustration of the high degree of proof the plaintiffs must meet in attacking a sale of this kind. There, the defendants launched their attack at a sales price that was ten times below the value of the property, and alleged various other irregularities, including the fact that negotiations were pending for a renewal of the indebtedness, that there had been a failure to record a power of attorney from the substituted trustee which was allegedly calculated to confuse those at the sale as to who had the authority to sell, and further, that there were intra-family relationships among the parties to the sale. The sale was held nonetheless to be valid.

The plaintiffs' case conceivably might be different if there were some allegation of fraud, or collusion between the substituted trustee and the defendant to announce an amount of $23,000 in excess of the actual indebtedness. But here, the $111,000 figure, while apparently still in dispute, has from the first been the figure the defendants have alleged both here and in the bankruptcy court. These facts, considered in the light of the fact that the sale was regular on its face and supported by the aforementioned recitals in the conveyance, virtually compel the conclusion that the defendant should prevail on this count in its motion for summary judgment.

### III.

In count three of their complaint, the plaintiffs charge defendant, NAC, with responsibility for the financial collapse of Southwestern Specialty Co. This cause of action is based upon allegations that sometime prior to March 21, 1962, the officers and directors of Southwestern, in need of ready cash to continue the daily operation of the company, entered loan negotiations with the defendant. In this connection Southwestern secured from its creditors assurances that credit would be extended on a ninety day basis, contingent upon the payment of past due accounts within a reasonable time. It was the plaintiffs' expectations to stave off the creditors' demands with the influx of new money into the corporation from the loan negotiated with NAC. During the period of negotiations immediately prior to the execution of the loan and security instruments, NAC made certain alleged oral representations that money loaned pursuant to the agreement would be forthcoming in a "very short period" from the date of execution. Elsewhere, and somewhat earlier in the negotiations, the plaintiff, Jack Berman, has testified that NAC promised Southwestern that it could expect the money by the second week of March. These two representations form the bases of this action. The first set of loan papers were signed on March 9, 1962 and the negotiations were concluded in final form and embodied in papers signed March 21, 1962. Before the loans came through, the creditors became uneasy and refused to grant further credit extensions; insolvency proceedings were later begun and the corporation was ultimately adjudged a bankrupt.

The plaintiffs now seek to defeat the loan agreement on the grounds that NAC failed to live up to its oral representations as to the exact date the money would be forthcoming, even though between March and October, 1962, Southwestern used and appropriated some $319,000 of the defendant's money. They allege that solely in reliance on NAC's oral representations that the money would be received in a "very short period" did they execute their individual guaranty and in their corporate capacity bind Southwestern. Since the company has

failed, the plaintiffs have lost their $500,-000 investment in it, plus the $25,000 lost in the Dawson Street property. This loss, say the plaintiffs, was directly and proximately caused by the failure of NAC to comply with its oral contract and representations regarding the speedy advancement of funds to Southwestern.

There are two interesting questions posed by the time sequence in these negotiations which might make good defenses to the plaintiffs' claim. There is the problem of the use and appropriation of over $300,000 of NAC's money during a period of seven months with full knowledge of a "breach" of the alleged oral contracts, and the question of how NAC could be expected to furnish money in the second week of March 1962 when the plaintiffs did not sign the final papers until March 21, 1962 in the third week of that month. However, these questions need not be pursued because, although raised, they were not strongly pressed at oral argument or in the briefs.

 There is a more solid ground urged by NAC based on the interworking of the doctrine of merger from the law of contracts and the parol evidence rule, not strictly speaking a rule of evidence, but a substantive rule from the law of contracts. As it is frequently stated, the doctrine of merger holds that all prior and contemporaneous negotiations and promises are absorbed or merged into a written contract. This normally occurs when the oral product of the negotiations is subsequently reduced to writing, and by virtue of the writing and merger, no prior or contemporaneous statements can be shown to vary or contradict the written terms. Albers v. Schumacher Co., 314 S.W.2d 852 (Tex.Ct.Civ.App.1958); Federal Underwriters Exch. v. Skinner, 146 S.W.2d 325 (Tex.Ct.Civ.App.1940). The parol evidence rule operates to exclude all evidence of prior or contemporaneous negotiations and representations that are introduced to vary, add to or contradict the unambiguous terms of a written contract, which the rule presumes embodies the full and complete agreement between the parties. See American Mfg.

Co. v. Witter, 342 S.W.2d 943 (Tex.Ct. Civ.App.1961). It is the joint operation of these rules which forecloses plaintiffs' defense.

 Undoubtedly there were oral negotiations leading up to the final execution of the papers on March 21st. Certainly oral understandings and verbal exchange are always the basis for the written contract. It may well be that NAC promised the money within a "very short period" after the date of execution. However, once these negotiations take the form of contractual obligations and are reduced to writing, the parties are presumed to have selected from these negotiations only the promises and agreements by which they choose to be bound. Obviously, if the rule were otherwise, the most carefully considered written documents could be destroyed by frivolous or gratuitous oral statements made during the ordinary give and take of negotiation. The plaintiffs cannot introduce this parol evidence to destroy mutual *promises fortified by writing.* It must be presumed that these oral representations were merged in the contract of March 21st.

 It should be pointed out that both the parol evidence rule and the doctrine of merger are subject to three well established exceptions. Prior and contemporaneous oral statements can be shown if the writing is infected with fraud or was concluded by accident or mistake. There is no indication, or even any allegations of fraud, accident or mistake in the loan negotiations; both parties were experienced business men contemplating an important economic endeavor, and both were fully aware of the consequences of their obligations. Accordingly, judgment will be entered for the defendant on this third count.

## IV.

At the time the plaintiffs amended their complaint and answer to defendant's counterclaim, they moved the Court for permission to join Lukin T. Gilliland, the trustee in bankruptcy, as party defendant. An Order so directing was

entered by the Court on April 30, 1964. Thereafter, the defendant NAC filed its cross-claim against the defendant-trustee. In this claim NAC seeks to recover funds in the hands of the trustee which it alleges are subject to its liens, namely, certain funds accumulated from accounts receivable and certain proceeds from the sale of inventory and other chattels of the debtor. These liens are said to arise consensually and were intended as security for sums borrowed by Southwestern. The outstanding indebtedness to NAC is presently in excess of $111,000. The trustee has since moved to dismiss the cross-complaint against him on the grounds that NAC's claim is properly cognizable in the bankruptcy court and not here.

■ The problem in this segment of the litigation is essentially a question of the propriety of a United States District Court exercising jurisdiction over a claim asserted against the bankrupt estate after bankruptcy proceedings have begun and before they have terminated therein. In an early case, the Supreme Court made it clear that the jurisdiction of the bankruptcy court in all proceedings in bankruptcy was intended by Congress to be exclusive of all other courts. United States Fid. & Guar. Co. v. Bray, 225 U.S. 205, 218, 32 S.Ct. 620, 56 L.Ed. 1055 (1912). The rule has particular application where, as here, the jurisdiction of the bankruptcy court first attaches and the bankrupt's estate is in custodia legis. The stability of the rule has withstood the test of time, and other circumstances in the last fifty years have not altered the basic soundness of the rule which is supported by the policy of orderly administration of bankruptcies.

■ It should be pointed out, however, that this rule does not have a bearing on an unobjected to disposition of claims or rights in the debtor's property in a more convenient forum. See, e. g., In re Gallimore, 21 F.2d 999 (5th Cir. 1927). Where the claims are elsewhere litigated, and the parties do not object, the jurisdiction of the other forum, be it federal or state, cannot be successfully challenged, at least so far as this rule of exclusivity is concerned.

Some later cases and authorities have recognized that there is a certain residuum of jurisdiction in the District Court created by virtue of the order of general reference. This becomes evident when the source of the referee's power to act is considered in connection with the District Court's general supervisory powers over bankruptcies. Collier expresses it this way: "But the terms of this General Order (of Reference) do not oust the judge of jurisdiction, and he may hear matters in the first instance that otherwise would go before the referee, although such action is ordinarily taken only under unusual circumstances." 2 Collier Bankruptcy, § 22.05 (14th ed. 1964). See also United States for Use and Benefit of Kirby v. Southern Constructors, Inc., 211 F.Supp. 537, 540 (W.D.Mo.1962). The jurisdiction retained by the reference court is thus severely limited by the "unusual circumstances" qualification.

A synthesis of the foregoing principles produces a rigid rule of exclusive jurisdiction of the bankruptcy court engendered by the Bray case with some small quantum of jurisdiction reserved to the district court for "unusual circumstances".

■ There is nothing "unusual" about the claim advanced by NAC in the instant case which would warrant this Court's taking jurisdiction over the cross-action. The claim of lien on the various assets of the debtor is a familiar one to the courts of bankruptcy, which normally entertain such claims, and which in these circumstances are best equipped to do so. The accident of complexity of this litigation should not obscure the fact that NAC would have had no opportunity to raise this claim without beginning an independent suit against the trustee. This would probably have been improper as it appears that NAC has already consented to have its claims determined in the bankruptcy court.

But even if this were not so, the Court considers orderliness in the administration of bankrupties to be of paramount importance and is equally attentive to the Congressional and judicial policy of one bankruptcy, one forum. These are far more desirable alternatives to extending the resolution of the debtor's obligations over two or more forums.

Accordingly, the trustee's motion to dismiss the cross-action against it will be granted, and NAC will be instructed to pursue whatever rights it has before the referee.